# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| THE DOW CHEMICAL COMPANY | Hon. Thomas L. Ludington |
| Plaintiff, | Case No(s).: 07-12012 |
| v. | AMENDED COMPLAINT |
| J. PEDRO REINHARD and ROMEO KREINBERG | |
| Defendants. | JURY TRIAL DEMANDED |

Plaintiff The Dow Chemical Company ("Dow" or "Plaintiff"), by and through its attorneys, for its Complaint against Defendants J. Pedro Reinhard ("Reinhard") and Romeo Kreinberg ("Kreinberg") (collectively, "Defendants"), states as follows:

1.    For decades, and at all relevant times, Defendants Reinhard and Kreinberg were among Plaintiff Dow's most senior and trusted executives. But in clear breach of their fiduciary duties to Dow, Defendants engaged in unauthorized and undisclosed discussions with third parties regarding proposed transactions that were fundamental to the future course of the company. Unaware of this information, Dow was enveloped by a swirl of extraordinarily disruptive published rumors that Dow was about to be hostilely acquired by a third party. As a result, Dow was forced to embark on a distracting and frustrating search to determine the validity and source of those rumors. Despite their awareness of this search and the adverse impact of the rumors on the company's many employees, Defendants never disclosed their participation in third-party discussions regarding proposed transactions.

2.    Dow brings this action to recover damages for Defendants' breaches of fiduciary duty, as well as to recover moneys owed by Defendants to Dow pursuant to various written

agreements with the company that are described more fully below. Dow also seeks a declaration that, as a result of Defendants' breaches of fiduciary duties and breaches of contract, Dow has no further financial obligations to Defendants.

## THE PARTIES

3.    Plaintiff The Dow Chemical Company has its principal place of business in Midland, Michigan, where for over a century its headquarters has been located. Dow is a leader in science and technology, providing innovative chemical, plastic and agricultural products and services to many essential consumer markets. Dow, including its consolidated subsidiaries, had annual sales of $49 billion in 2006 and employs approximately 43,000 people worldwide. The company is a Delaware corporation and is publicly-traded on the New York Stock Exchange.

4.    Defendant J. Pedro Reinhard is an individual residing in Key Biscayne, Florida. Reinhard is a citizen and a domiciliary of Florida. Reinhard previously served as Dow's chief financial officer and is a member of Dow's Board of Directors until May 10, 2007.

5.    Defendant Romeo Kreinberg is an individual residing in Key Biscayne, Florida. Kreinberg is a citizen and a domiciliary of Florida. At the time of his termination from Dow, Kreinberg was Dow's executive vice president for the Performance Plastics & Chemicals Portfolio.

## JURISDICTION AND VENUE

6.    There is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs. This Court therefore has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

7.     This action also arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims against Defendants arising under state law.

8.     The claims against Reinhard and Kreinberg derive from a common nucleus of operative fact. Upon information and belief, Reinhard and Kreinberg acted in concert in conducting their unauthorized and undisclosed discussions with third parties regarding proposed transactions involving Dow. Defendants' joint actions give rise to the state and federal claims set forth in this lawsuit.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. The ultimate focal point of this dispute is Dow's headquarters and principal place of business in Midland, Michigan, which was the target and victim of Defendants' misconduct. In addition, venue is proper in this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the benefit plans at issue are administered in this judicial district.

## FACTUAL ALLEGATIONS

### I.     DOW HIRES DEFENDANTS, AND DEFENDANTS RISE TO BECOME SENIOR EXECUTIVES AT DOW.

10.     Defendant Reinhard joined Dow on October 14, 1970 and rose to become one of Dow's most senior and trusted executives. After initially joining Dow's Finance Department, Reinhard was appointed finance director of Dow Brazil in 1978. After three years in that position, Reinhard was appointed finance director of Dow Europe in 1981. Reinhard was elected an assistant treasurer by Dow's Board of Directors in 1984 and became vice president of Dow

Europe and managing director of Dow in Italy in 1985. He was elevated to treasurer of The Dow Chemical Company in 1988, was named a vice president of the company in 1990 and was elected financial vice president in 1995. Also in 1995, Reinhard was elected to the Board of Directors, the Executive Committee, and the Finance Committee. He was also named chief financial officer. Reinhard was elected executive vice president in 1996. Reinhard retired as chief financial officer effective October 1, 2005 and retired as an executive vice president effective December 31, 2005, though he retained his position as an employee director on Dow's Board of Directors.

11.    As a senior executive and director at Dow, Reinhard was intimately involved in Dow's most important strategic decisions and had access to Dow's most sensitive, proprietary, and confidential information. As a result of his various positions, Reinhard owed Dow various fiduciary duties, including fiduciary duties of candor and undivided loyalty.

12.    Defendant Kreinberg joined Dow in 1977 and also rose to become one of Dow's most senior and trusted executives. Kreinberg held a series of sales, marketing, business operations and commercial management positions in Europe until 1992, when he was named general manager for Dow Italy and vice president of Dow Europe. He subsequently held global vice president and business group president positions until he became senior vice president for plastics at Dow in 2003. In 2004, he became a member of Dow's Office of the Chief Executive. After serving as Dow's senior vice president of Plastics, on September 15, 2005 Kreinberg was named executive vice president for the Performance Plastics & Chemicals Portfolio. Kreinberg was also a member of Dow's Executive Leadership Committee, which is tasked with defining Dow's strategic direction.

13.    As a senior executive at Dow, Kreinberg was intimately involved in Dow's most important strategic decisions and had access to Dow's most sensitive, proprietary, and confidential information. As a result of his various positions, Kreinberg owed Dow various fiduciary duties, including fiduciary duties of candor and undivided loyalty.

## II.    DOW EMBARKS ON NEW STRATEGIC INITIATIVE.

14.    The operative events in this lawsuit find a critical point in July 2006. That month Dow held a weeklong retreat for its board and senior management. The express aims of that retreat were (i) to educate new directors about the ins and outs of serving as a board member and (ii) to discuss corporate strategy. Both Kreinberg and Reinhard attended this meeting.

15.    During this meeting, Dow's leadership heard formal presentations reviewing a proposal that Dow pursue a new strategy to extract more value from Dow's cyclical commodities business and direct some of the resulting funds into the company's lucrative specialty-products business.

16.    This July 2006 meeting culminated with the Board adopting a significant strategy to focus on Dow's higher-profit, specialty products. Dow would focus its global resources and formidable research and development on tackling pressing global issues with high-performance products.

17.    Defendants were centrally involved in all aspects of this new initiative.

18.    Specifically, Kreinberg played a key role in executing this plan. He served as a senior executive in the critical specialty-products business. He was a leader in the new focus on

these markets. Kreinberg had access to all manner of detailed plans for these products, operations, and overall business.

19.    As a director, Reinhard was also directly responsible for overseeing this new strategy. He received regular updates on its implementation. He participated actively in essential oversight and direction. Reinhard knew exactly where Dow was moving.

20.    Armed with their knowledge of Dow's innermost secrets and latest plans, Defendants would launch themselves on a course of deception and betrayal.

## FOLLOWING DOW'S NEW STRATEGIC INITIATIVE, THERE ARE REPEATED PRESS REPORTS OF MAJOR PROPOSED TRANSACTIONS INVOLVING DOW, WHICH CLOUDED DOW'S FUTURE AND ROILED ITS MANAGEMENT AND EMPLOYEES.

21.    Soon after Dow began to pursue its new strategic initiative, repeated press reports began to surface that Dow was going to be involved in a major proposed transaction. These press reports clouded Dow's future, distracted Dow from its business objectives, and roiled its management and employees. Accordingly, Dow began an effort to assuage these negative effects on Dow's business, determine the source of these rumors, and assess their validity.

22.    The first press coverage was in January 2007. Specifically, on the morning of January 18, 2007, the *Financial Times* ran a story in which it was reported that "talk in the market was that a consortium of private equity groups was working on a break-up bid for Dow Chemical."

23.    The rumors in the January 18, 2007 *Financial Times* story were disruptive and a matter of great concern to Dow. Accordingly, Dow began an inquiry to determine: (i) whether there was a basis for these rumors; and (ii) the source of these rumors. As part of this inquiry,

Dow pursued information from the investment banking and financial community regarding potential bids for some or all of Dow. Although both Reinhard and Kreinberg were aware of this inquiry and its importance to Dow, neither Reinhard nor Kreinberg informed Dow about any knowledge they had regarding these rumored transactions involving Dow.

24.     Dow's Board of Directors discussed the January 18, 2007 *Financial Times* rumors at its February 14, 2007 board meeting. Although Reinhard attended that meeting, and Kreinberg was aware of the meeting, neither told the board members that he had any knowledge about potential major transactions involving Dow.

25.     On the morning of February 25, 2007, the *Sunday Express* reported that Dow was "set to become the target of the world's largest-ever leveraged buyout," with three private equity firms ready to bid $54 billion for Dow.

26.     As with the January 18, 2007 *Financial Times* rumors, the rumors in the February 25, 2007 *Sunday Express* story were again disruptive and a matter of great concern to Dow. Accordingly, Dow vigorously continued its inquiries, including its inquiries with the investment banking and finance community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors. Although both Reinhard and Kreinberg were aware of these inquiries and their importance to Dow, again neither Reinhard nor Kreinberg informed Dow about any knowledge they had about potential major transactions involving Dow.

27.     On March 12, 2007, the *Evening Standard* ran a story naming a banker as the "mastermind" of a $60 billion leveraged buyout of Dow, which would be "the largest buyout the world has ever seen."

28.     As with the January 18, 2007 *Financial Times* rumors and the February 25, 2007 *Sunday Express* rumors, the rumors in the March 12, 2007 *Evening Standard* story were again damaging and a matter of great concern to Dow.  Accordingly, Dow continued its quest to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors.  Although both Reinhard and Kreinberg were aware of these inquiries and their importance to Dow, again neither Reinhard nor Kreinberg informed Dow about any knowledge they had about discussions among certain third-parties regarding potential transactions involving Dow.

29.     The persistent rumors about potential transactions involving Dow were taken up specifically at a March 16, 2007 meeting of Dow's Board of Directors, which Reinhard attended.

30.     On March 15, 2007 — the day before the March 16 meeting of Dow's Board of Directors — Kreinberg responded to an email sent to him by an employee who reported to him.  The employee's email forwarded Kreinberg the portion of the *Evening Standard* story describing the possible $60 billion takeover of Dow.  Kreinberg authored this response: "E se non e vero, e ben trovato.  Which means in italian, if its not true its well invented."

31.     At the March 16 meeting of Dow's Board of Directors, Reinhard did not inform Dow that he had any knowledge about discussions among third-parties regarding potential major transactions involving Dow.

**IT IS FINALLY REVEALED — BY SOURCES OTHER THAN DEFENDANTS — THAT DEFENDANTS WERE MEETING WITH INVESTMENT BANKERS REGARDING POTENTIAL MAJOR TRANSACTIONS INVOLVING DOW.**

32.     The events that unfolded after the March 16 meeting of Dow's Board of Directors culminated in the identification of Defendants as persons who had played a role in discussions about potential major transactions involving Dow.

33.    On April 8, 2007, the *Sunday Express* trumpeted that a buyout of Dow "could be days away, as a consortium of Middle Eastern investors and American buyout firms puts the finishing touches to an approach for U.S. giant Dow Chemical."

34.    As with the previous rumors regarding potentially huge transactions involving Dow, the rumors in the April 8, 2007 *Sunday Express* story were disruptive and a matter of great concern to Dow.    Accordingly, Dow continued its inquiries, including inquiries with the investment banking and finance community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors.  Although both Reinhard and Kreinberg were aware of these inquiries and their importance to Dow, neither Reinhard nor Kreinberg informed Dow that they had any knowledge about discussions among third-parties regarding potential major transactions involving Dow.

35.    Within 48 hours of the *Sunday Express* story, information regarding potential transactions involving Dow that wasn't revealed by Defendants was shared with Dow by a major international financial institution (the "Bank").

36.    On April 9, 2007, Dow issued a press release stating:  "The Company has had no discussions about a leveraged buyout."  The press release did not cause Reinhard and Kreinberg to come forward or otherwise divulge the role they had played.

37.    That same day, the Bank's CEO and another senior banker traveled to Midland, Michigan to have a previously-scheduled dinner with two senior executives from Dow, including Dow's CEO. That evening, the Bank's CEO explained that the Bank's London affiliate had been working on behalf of certain Middle Eastern investors on potential major transactions involving Dow.  The Bank's CEO subsequently explained that a variety of potential transactions were

being discussed, including a purchase of Dow in its entirety. He also revealed that people close to Dow were involved in the discussions, and he committed to identifying who those persons were.

38. On April 10, 2007, a day after their dinner, the Bank's CEO called Dow's CEO and identified Reinhard and Kreinberg as the Dow employees involved in the discussions with third-parties about a major transaction involving Dow. He also told Dow's CEO that these two Dow employees had discussions with representatives of the Bank's London affiliate.

## DOW'S BOARD OF DIRECTORS ACTS DELIBERATELY AND PROMPTLY TO TERMINATE DEFENDANTS' EMPLOYMENT.

39. Accordingly, three months after the extraordinarily distracting rumors about Dow first surfaced, Dow finally learned that two of its most trusted senior executives had not disclosed their personal involvement in unauthorized discussions with third-parties at the center of the rumored transactions. This startling realization was worsened by the fact that Dow did not learn of the senior executives' involvement from the senior executives themselves, but rather from a third party source.

40. Early on April 11, 2007, Dow's CEO informed Dow's Presiding Director and the Chair of Dow's Audit Committee of the information that he had learned from the Bank's CEO. Dow's Board of Directors had a regularly scheduled meeting on April 11, and Dow's CEO, as Chairman, made this the first item of business for the meeting at 3:45 p.m. Reinhard was not present at the meeting as he had previously informed Dow's CEO that he had a conflict that day. Dow's CEO presented to the Board the information he had, and then asked for the Board's thoughts as to how he should proceed. The Board discussed the situation at length and asked many questions about the activities of Reinhard and Kreinberg and the credibility of the

information provided to Dow's CEO by the Bank's CEO. There was unanimous agreement among the directors that the information was credible, and that the two employees should be terminated.

41.     However, the Board asked Dow's CEO to meet with each employee, present the newly-uncovered information, and ask for their explanation. Those meetings were arranged for 7:00 a.m. on April 12, 2007. The Board asked the following individuals to join Dow's CEO at the meetings: Charles Kalil, Paul Stern, and Arnold Allemang (a member of the Board). Martin Lipton, outside counsel for Dow, also attended.

42.     On April 12, 2007, the group identified above met separately with Reinhard and then with Kreinberg, beginning at 7:00 a.m. Both Reinhard and Kreinberg denied the allegations against them without offering any sort of explanation.

43.     Given the aforementioned denials, and following those meetings, Dow's CEO and its outside counsel placed calls to the Bank's CEO and the Bank's general counsel. The Bank's CEO reconfirmed the information that he had previously provided to Dow's CEO.

44.     The Executive Committee of Dow's Board met the morning of April 12, 2007 and the other Directors, with the exception of Reinhard, were invited to attend. Dow's CEO informed the Committee of the meetings with Reinhard and Kreinberg, the fact that their employment was terminated, as well as the follow-up calls to the Bank's CEO and general counsel. The Committee then voted to remove Kreinberg as a Dow officer.

45.    As a result of their serious misconduct and conduct harmful to the interest of the company, including their breaches of fiduciary duty and breaches of the express terms of their contracts with Dow, Dow terminated the employment of Reinhard and Kreinberg.

## REINHARD AND KREINBERG HAVE PLAINLY BREACHED THEIR COMPENSATION AGREEMENTS WITH DOW.

46.    Dow acted promptly to terminate Defendants' employment due to their repeated and serious misconduct that served to advance their own agendas at the expense of Dow. As described in more detail below, Defendants' actions and the consequent termination of their employment by Dow has serious effects on their past and present compensation arrangement, including the cancellation of certain outstanding equity awards and the obligation of Defendants to repay certain amounts previously realized in respect of certain equity awards.

47.    Both Defendants have received significant equity-based awards under, among other plans, The Dow Chemical Company 1988 Award and Option Plan (the "1988 Plan"). Each Defendant has received the following relevant equity awards under the 1988 Plan: (i) awards of stock options ("Stock Options"), (ii) awards of performance shares (including certain performance deferred shares) ("Performance Awards") and (iii) awards of deferred stock (including certain other performance deferred shares) ("Deferred Stock Awards"). In addition, both Defendants receive dividend unit awards ("Dividend Units") under The Dow Chemical Company Dividend Unit Plan (the "Dividend Unit Plan"). These four types of awards are referred to as the "Equity Awards." Immediately prior to the termination of his employment, Kreinberg had outstanding Equity Awards with an estimated value of $15,000,000 and, in the three years prior to his termination, Kreinberg had recognized approximately $5,000,000 in value from his Equity Awards. Similarly, immediately prior to the termination of his employment,

Reinhard had outstanding Equity Awards with an estimated value of $16,200,000 and, in the three years prior to his termination, Reinhard had realized approximately $14,700,000 in value from his Equity Awards. These awards were made by Dow to, among other things, encourage and reward loyal service to Dow.

## A.    Equity Awards Issued Under the 1988 Plan

48.    The 1988 Plan is administered by Dow's Compensation Committee. Section 4.02 of the 1988 Plan provides that the Compensation Committee has the full power to interpret and administer the Plan and that any "interpretation by the [Compensation] Committee of the terms and provisions of the Plan and the administration thereof, and all action taken by the [Compensation] Committee, shall be final, binding and conclusive on the Company, ... all Employees, their respective legal representatives, successors and assigns and upon all other persons claiming under or through any of them."

49.    Each Equity Award made to Defendants under the 1988 Plan is subject to the terms and conditions of the 1988 Plan itself and an award agreement that sets out certain very specific conditions that apply to such awards. Although the terms and conditions applicable to each such Equity Award vary somewhat in detail, and with one exception not here relevant, each Equity Award issued to Defendants under the 1988 Plan that is relevant to this claim provides that (i) the Equity Award is immediately canceled and forfeited if the holder's employment with Dow and its affiliated companies is terminated for any reason other than death, disability or retirement, (ii) each Equity Award that has not previously been terminated is canceled and forfeited if the holder engages in certain activities determined to be harmful or adverse to Dow or its affiliates and (iii) if the holder engages in certain activities determined to be harmful or

adverse to Dow or its affiliates, the holder may be required to repay any value the holder received in respect of any Equity Award during the three-year period preceding such activities.

50.    By way of example, Section 2 of certain agreements covering Stock Options granted to Defendants provide that "[e]xcept in the case of death, disability or retirement, this Agreement shall terminate as soon as you are no longer employed by the Company or any Subsidiary or Affiliate (collectively, a "Dow Company"), notwithstanding the fact that the stated term of this Agreement may not have expired." Section 7 of these Stock Option agreements provide that "[i]f you engage . . . in any activity harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . then any Option under this Agreement shall terminate effective on the date on which you enter into such activity. . . . The Compensation Committee shall, in its sole discretion, determine whether the above conditions have been met, and the determination of the Compensation Committee shall be final and binding as to all parties." Section 6 of these Stock Option agreements further provide that "[i]f at any time within three years after you exercise any portion of this Option you engage in any activity, . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . any [option spread realized] on the date of exercise shall be paid by you to the Company."

51.    In the same vein, Section 6 of certain agreements covering Performance Awards granted to each Defendant provide that "[e]xcept in the case of retirement, disability or death, this Agreement shall terminate upon your voluntary or involuntary termination of a Dow Company. Participation shall be automatically terminated and all rights under this Agreement forfeited by you if the Compensation Committee, in its sole judgment, determines that you have

at any time during the term of this Agreement engaged in any activity harmful to the interests of or in competition with a Dow Company." Section 8 of these Performance Award agreements further provide that "[i]f at any time within three years after the end of the Performance Period, you engage in any activity . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . the [value previously received pursuant to the Performance Award] shall be paid by you to the Company."

52.    Section 4 of certain agreements covering Deferred Stock Award granted to Defendants similarly provide that "[t]his Agreement shall terminate and your rights under this Agreement shall be forfeited if you employment with any Dow Company is terminated for any reason other than death, disability or retirement." Section 8 of these Deferred Stock Award agreements further provide that "[i]f you at any time during the term of this Agreement you engage in any act of Unfair Competition (as defined below), this Agreement shall terminate effective on the date on which you enter into such act of Unfair Competition . . . In addition, if at any time within three years after issuance and delivery of this Deferred Stock you engage in any act of Unfair Competition, you shall promptly pay to the Company the [value previously received pursuant to the Deferred Stock Award]. The Compensation Committee shall, in its sole discretion, determine when any act of Unfair Competition has occurred, and the determination of the Compensation Committee shall be final and binding as to all parties. For purposes of this Agreement, the term 'Unfair Competition' shall mean and include activity on your part that . . . is or may be harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought . . . ."

**B.    Equity Awards Issued Under the Dividend Unit Plan**

53.    The Dividend Unit Plan is also administered by the Compensation Committee. Section 4.02 of the Dividend Unit Plan provides that the Compensation Committee has the full power to interpret and administer the Plan and that any "interpretation by the Compensation Committee of the terms and provisions of the Plan and the administration thereof, and all action taken by the Compensation Committee, shall be final, binding and conclusive on the Company, . . . all Employees, their respective legal representatives, successors and assigns and upon all other persons claiming under or through any of them."

54.    Each Equity Award made to Defendants under the Dividend Unit Plan is subject to the terms and conditions of the Dividend Unit Plan. The Dividend Unit Plan provides that Dividend Units may be forfeited "if the Awardee terminates his or her employment with the Company or its Subsidiaries for any reason other than death or retirement . . . Dividend Units may further be forfeited by an Awardee if the Committee determines that the Awardee has at any time engaged in any activity harmful to the interest of or in competition with the Company or its Subsidiaries or accepts employment with a competitor."

**C.    Termination of Defendants and the Effect on Their Equity Awards**

55.    At a meeting duly convened on April 12, 2007, the Compensation Committee discussed the termination of Kreinberg and Reinhard and determined that they each had engaged in serious misconduct and conduct harmful to the interests of Dow.    The Compensation Committee then authorized certain employees of Dow to take any and all action on behalf of Dow as may be necessary and sufficient to freeze, terminate and/or "claw-back" any and all remuneration and benefits of each of Kreinberg and Reinhard.    At this meeting, the

Compensation Committee did not conclude that Kreinberg or Reinhard had retired from Dow for purposes of any of their Equity Awards.

56.    As a result of Dow's prompt and proper action in terminating Defendants for the actions described herein, Dow (i) is entitled to be repaid certain amounts realized by Defendants in connection with Equity Awards previously granted to them under the 1988 Plan and (ii) has no further obligations to Defendants under any Equity Awards outstanding at the time of their termination of employment. Dow now brings this action to recover these amounts and to obtain a declaration recognizing the termination of any further obligations under the Equity Awards.

### D.    Defendants Forfeit Other Benefits by Breaching Their Duty of Loyalty

57.    During his employment with Dow, Reinhard participated in the Key Employee Insurance Program ("KEIP"), a nonqualified employee pension benefit plan subject to ERISA. Dow is the plan administrator for the KEIP. These KEIP benefits are subject to offset for damages caused by, and forfeiture in the event of, a participant's breach of duty of loyalty to his employer. Reinhard has breached his duty of loyalty to Dow and is not entitled to any benefits under the KEIP.

58.    On April 12, 2007, Dow terminated the employment of Reinhard and Kreinberg as a consequence of their serious misconduct that was harmful to the interest of the company. Dow, which is plan administrator of The Dow Chemical Company Medical Care Program ("Medical Plan"), determined that the Defendants are not entitled to "COBRA" health continuation coverage under the Medical Plan pursuant to ERISA's "gross misconduct" exception (ERISA § 603(2)) to COBRA coverage. Furthermore, upon the end of their employment, pursuant to Section 606 of ERISA, 29 U.S.C. § 1166, Dow, as plan administrator

of the Medical Plan, would have ordinarily provided Defendants notice of their respective

COBRA rights (*i.e.*, rights to temporary continuation of health benefits) through its third-party

administrator.  Due to Defendants' gross misconduct, however, Dow, as plan administrator, is

not required by ERISA to notify Defendants of their respective COBRA rights, and therefore has

not provided Defendants with notice of their respective COBRA rights.

<u>COUNT I</u>

**(BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS)**

59.    Dow realleges and incorporates by reference each of the allegations made herein

at paragraphs 1 through 58, inclusive.

60.    Defendant Reinhard, by virtue of his position as a senior executive, officer, and

director of Dow, owed Dow various fiduciary duties, including the fiduciary duties of loyalty and

candor.

61.    Defendant Kreinberg, by virtue of his position as a senior executive and officer of

Dow, owed Dow various fiduciary duties, including the fiduciary duties of loyalty and candor.

62.    Defendants Reinhard and Kreinberg breached their fiduciary duties to Dow by,

among other things, engaging in secret and unauthorized discussions for their own benefit with

third-parties regarding proposed transactions involving Dow, and by failing to disclose those

discussions even while Dow was searching to determine the validity and source of rumors that

Dow was about to be hostilely acquired by a third party.  These rumors were doing great damage

to Dow and were highly disruptive.

63.    As a result of Defendants' breaches of fiduciary duty, Dow has been damaged in an amount to be proven at trial.

## COUNT II

### (BREACH OF CONTRACT AGAINST ALL DEFENDANTS)

64.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 63, inclusive.

65.    Plaintiff and Defendants are parties to agreements covering Equity Awards issued under the 1988 Plan.

66.    The agreements covering each Deferred Stock Award, Stock Option, and Performance Award, are valid, binding, and enforceable contracts between Plaintiff and Defendants.

67.    Each of the agreements covering each Deferred Stock Award provides that Defendants are required to repay amounts realized in respect of the Deferred Stock Award within three years of the date Defendants engage in activity harmful to the interests of Dow or its affiliates. As an illustrative example, paragraph 8 of a Deferred Stock Award agreement to which the Defendants are party provides:

> If at anytime within three years after issuance and delivery of this Deferred Stock you engage in any act of Unfair Competition, you **shall promptly pay** to the Company the Fair Market Value of Shares Earned and Dividends Equivalents paid.    The Compensation Committee shall, in its sole discretion, determine when any act of Unfair Competition has occurred, and the determination of the Compensation Committee shall be **final and binding** as to all parties. For purposes of this Agreement, the term "Unfair Competition" shall mean and include activity on your part that . . . is or may be harmful to the interests of a Dow Company,

> including but not limited to conduct related to your employment
> for which either criminal or civil penalties against you may be
> sought . . . (*emphasis added*)

68.    On April 12, 2007, Dow's Compensation Committee determined that Defendants

had engaged in serious misconduct and conduct harmful to the interests of Dow and authorized

certain officers of Dow to take all actions necessary and sufficient to "claw-back" any and all

remuneration and benefits, in whatever form, of the Defendants.

69.    Despite this finding by Dow's Compensation Committee, which is "final and

binding as to all parties," Defendants have breached their obligation to pay promptly to Dow "the

Fair Market Value of Shares Earned and Dividends Equivalents paid" under the agreements

covering each Deferred Stock Award.

70.    Each of the agreements covering each Stock Option provides that the Defendants

are required to repay amounts realized in respect of the Stock Option within three years of the

date Defendants engage in activity harmful to the interests of Dow or its affiliates.  As an

illustrative example, paragraph 6 of a Stock Option agreement to which the Defendants are party

provides:

> If at any time within three years after you exercise any portion of
> this Option you engage in any activity . . harmful to the interest of
> a Dow Company, including but not limited to conduct related to
> your employment for which either criminal or civil penalties
> against you may be sought, . . . any [option spread realized] on the
> date of exercise shall be paid by you to the Company.

71.    Despite Dow's Compensation Committee's finding on April 12, 2007, that

Defendants had engaged in misconduct, Defendants have breached their obligation to pay

promptly to Dow the option spread realized under the agreements covering each Stock Option.

72.    Each of the agreements covering each Performance Award provides that the Defendants are required to repay amounts realized in respect of the Performance Award if, within three years of the end of the applicable performance period, the Defendants engage in activity harmful to the interests of Dow or its affiliates. As an illustrative example, paragraph 8 of a Performance Award agreement to which the Defendants are party provides:

> If at any time within three years after the end of the Performance Period, you engage in any activity . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . the [value previously received pursuant to the Performance Award] shall be paid by you to the Company.

73.    Despite Dow's Compensation Committee's finding on April 12, 2007, that Defendants had engaged in misconduct, Defendants have breached their obligation to pay promptly to Dow the value previously received pursuant to the Performance Award under the agreements covering each Performance Award.

74.    As a result of Defendants' breaches of contract, Dow has suffered damages in an amount to be proven at trial.

## COUNT III

### (DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS)

75.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 74, inclusive.

76.    Dow seeks a judicial determination and declaration of its contractual rights pursuant to 28 U.S.C. § 2201.

77.    Specifically, Dow is entitled to a declaratory judgment that Reinhard and Kreinberg are obligated to:

    a.    Pursuant to the terms of the 1988 Plan and each agreement covering each Deferred Stock Award, pay to Dow the fair market value of any Deferred Stock Awards received during the three-year period prior to the date Defendants engaged in misconduct harmful to Dow and/or its affiliates.

    b.    Pursuant to the terms of the 1988 Plan and each Stock Option agreement, pay to Dow the option spread on the date of exercise of each Stock Option exercised during the three-year period prior to the date Defendants engaged in misconduct harmful to Dow and/or its affiliates.

    c.    Pursuant to the terms of the 1988 Plan and each agreement covering each Performance Award, pay to Dow the value received pursuant to Performance Award with respect to which the applicable performance period ended during the three-year period prior to the date Defendants engaged in misconduct harmful to Dow and/or its affiliates.

78.    There is an actual controversy within the jurisdiction of this Court between Dow and Reinhard and Kreinberg with respect to the Defendants' obligations to repay certain amounts of the Equity Awards in that the Defendants have denied engaging in harmful conduct that would trigger their repayment obligations.

79.    Resolution of this controversy requires a declaration by this Court of the Defendants' repayment obligations with respect to their Equity Awards.

## COUNT IV

### (DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS)

80.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 79, inclusive.

81.    Dow seeks a judicial determination and declaration of its contractual rights pursuant to 28 U.S.C. § 2201.

82.    Dow respectfully requests that this Court declare that Dow has no further obligation to either Defendant in respect of their Equity Awards, whether issued pursuant to the 1988 Plan or the Dividend Unit Plan. As set forth above, each of the Equity Awards were to be terminated and forfeited upon the termination of Defendants' employment for any reason other than death or, in most cases, disability or retirement. Because the Compensation Committee did not determine that either Defendant "retired" for purposes of these Equity Awards, these Equity Awards are no longer in force or effect.

83.    Moreover, each Equity Award provides that it is to be terminated and forfeited if the Defendants engaged in activities harmful to Dow or certain of its affiliates.   The Compensation Committee specifically determined that each Defendant engaged in serious misconduct and conduct harmful to the interests of Dow.   Accordingly, each of the Equity Awards is no longer in force or effect.

84.    There is an actual controversy within the jurisdiction of this Court between Dow and Reinhard and Kreinberg with respect to their rights to the Equity Awards in that the Defendants have denied engaging in harmful conduct that would terminate their rights to the Equity Awards.

## COUNT V

### (DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS)

85.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 84, inclusive.

86.     Pursuant to 28 U.S.C. § 2201, Dow seeks a judicial determination and declaration
of its contractual rights and its legal rights under ERISA.

87.     Dow respectfully requests that this Court declare that:

    a.    Reinhard has forfeited any and all benefits under the KEIP as a
result of Reinhard's disloyal conduct;

    b.    Dow has a right to offset against amounts payable to Reinhard
under the KEIP for damages sustained by Dow as a result of
Reinhard's disloyal conduct; and

    c.    Due to Defendants' gross misconduct, Dow is not required by
ERISA to notify Defendants of their respective COBRA rights.

88.     There is an actual controversy within the jurisdiction of this Court between Dow
and Reinhard with respect to Reinhard's rights to benefits under the KEIP. Reinhard admits this
controversy in his lawsuit in the United States District Court for the Southern District of New
York (filed after Dow initiated this action in its proper forum), which seeks from Dow, among
other things, these forfeited pension benefits.

89.     There is an actual controversy within the jurisdiction of this Court between Dow
and Defendants with respect to Defendants' rights to notice of their COBRA health continuation
coverage in that Defendants have denied their gross misconduct.

90.     The dollar value of these forfeited pension and other benefits are substantial, and,
upon information and belief, exceeds $1,000,000.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Dow respectfully requests that this Honorable Court
hold a jury trial and:

    (a)    Enter judgment for Plaintiff on all of its claims; and

(b)    Award Dow all amounts that it is entitled to as a result of Defendants' breaches of fiduciary duty, together with interest, costs, attorney's fees, punitive damages, and such other relief as may be just and equitable.

(c)    Award Dow all amounts that it is entitled to as a result of Defendants' breaches of contract, together with interest, costs, attorney's fees, and such other relief as may be just and equitable.

(d)    Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Defendants are obligated to:

      i.      Pursuant to the terms of the 1988 Plan and each agreement covering each Deferred Stock Award, pay to Dow the fair market value of any Deferred Stock Awards received during the three-year period prior to the date Defendants engaged in misconduct harmful to Dow and/or its affiliates;

      ii.     Pursuant to the terms of the 1988 Plan and each Stock Option agreement, pay to Dow the option spread on the date of exercise of each Stock Option exercised during the three-year period prior to the date Defendants engaged in misconduct harmful to Dow and/or its affiliates;

      iii.    Pursuant to the terms of the 1988 Plan and each agreement covering each Performance Award, pay to Dow the value received pursuant to Performance Award with respect to which the applicable performance period ended during the three-year period prior to the date Defendants engaged in misconduct harmful to Dow and/or its affiliates; and

(e)    Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Dow has no further obligation with respect to either Defendant in respect of their Equity Awards;

(f)    Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that:

      i.      Reinhard has forfeited any and all benefits under the KEIP as a result of Reinhard's disloyal conduct;

    ii.    Dow has a right to offset against amounts payable to Reinhard under the KEIP for damages sustained by Dow as a result of Reinhard's disloyal conduct; and

    iii.    Due to Defendants' gross misconduct, Dow is not required by ERISA to notify Defendants of their respective COBRA rights; and

    (g)    Award Dow such other relief as may be just and equitable.

Dated: May 16, 2007

                            s/Craig W. Horn
                         Craig W. Horn (P34281)
                         BRAUN KENDRICK FINKBEINER P.L.C.
                         4301 Fashion Square Blvd.
                         Saginaw, Michigan 48603
                         Telephone: (989) 498-2100
                         Facsimile: (989) 799-4666
                         crahor@bkf-law.com
                         P34281

                         David M. Bernick, P.C.*
                         Stephen Fraidin*
                         Peter D. Doyle*
                         KIRKLAND & ELLIS LLP
                         Citigroup Center
                         153 East 53rd Street
                         New York, New York 10022-4611
                         Telephone: (212) 446-4800
                         Facsimile: (212) 446-4900
                         (*pro hac vice admission to be requested)

                         Counsel for Plaintiff
                         THE DOW CHEMICAL COMPANY