**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — x

J. PEDRO REINHARD, :

                 Plaintiff, : 07 Civ.

      - against - : <u>Complaint</u>

THE DOW CHEMICAL COMPANY and :
ANDREW N. LIVERIS, :

             Defendants. :

— — — — — — — — — — — — — — — — — — — x

      Plaintiff J. Pedro Reinhard, by his attorneys Kramer Levin Naftalis & Frankel

LLP, for his complaint against defendants The Dow Chemical Company ("Dow" or "the

Company") and Andrew N. Liveris, alleges as follows:

Nature of this Action

     1.    This is an action for libel and breach of contract. Mr. Reinhard has

devoted his entire professional life to Dow, rising through the ranks over the course of a

distinguished thirty-seven year career to become its Chief Financial Officer and a member of its

Board of Directors. Along the way, Mr. Reinhard earned a reputation for honesty, integrity,

loyalty, and commitment to the success of the Company and the welfare of its shareholders.

After he retired from active management in 2005 at the age of sixty, and in recognition of his

reputation, experience, knowledge, and skill, Mr. Reinhard was invited to continue to serve as a

member of the Dow Board. Mr. Reinhard has also served with distinction for over six years as a

member of the Boards of Directors of several other major public companies.

2.    On the morning of April 12, 2007, prior to a regularly scheduled meeting of the Dow Board, Mr. Reinhard was summoned to the office of Andrew N. Liveris, Dow's President, Chairman, and Chief Executive Officer.  Mr. Liveris told Mr. Reinhard that the Company had concluded that he had engaged in "grave" misconduct, including serious breaches of his fiduciary duties, by participating in meetings with financial institutions in furtherance of a takeover or acquisition of Dow.  Mr. Liveris declared that the Company intended to fire Mr. Reinhard from his position at Dow.  He offered to allow Mr. Reinhard to keep all financial benefits to which he was entitled by virtue of his service to Dow, without penalty, if he tendered his resignation on the spot.

3.    Because Mr. Liveris' and Dow's charges were completely false, Mr. Reinhard protested that he did not breach any fiduciary duties and refused to resign.  Mr. Liveris did not provide details of the alleged misconduct; he would only say that he had "received information" that Mr. Reinhard had been a participant in meetings with financial institutions in furtherance of a takeover of Dow.  Shortly thereafter, Mr. Reinhard left the building with Dow security guards following him.

4.    Later that morning, Dow issued a press release widely disseminated in the financial press and elsewhere, stating that Mr. Reinhard had "engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct."  The press release further asserted that Mr. Reinhard had been "involved in unauthorized discussions with third parties about the potential acquisition of [Dow]," and quoted Mr. Liveris as saying "we are greatly saddened by the disrespect shown by our former colleagues."  The press release reported that Dow had learned "information about the misconduct" just two days earlier, on April 10.  The press release also reported that Dow had terminated Mr. Reinhard with the full support of the

- 2 -

Board, based on the libelous charges. In a *Wall Street Journal* article the next day, a Dow spokesperson was quoted as saying that Mr. Reinhard had engaged in "multiple meetings in multiple months in multiple locations" and "with a number of different parties," including more than one investment bank.

5.      During the following week, Mr. Liveris and a Dow spokesperson repeated and underscored these false allegations in statements published in *The Wall Street Journal, The New York Times, Financial Times* and other major newspapers and media outlets, claiming among other things that the evidence against Mr. Reinhard was "irrefutable," that the sources of the evidence were "absolutely watertight," and that Mr. Reinhard had "made a tragic mistake." These statements were published after Mr. Reinhard had issued, on April 16, a public statement categorically denying defendants' charges.

6.      On April 16, 2007, the Dow Board held a meeting, at which Mr. Reinhard read his public statement to the Dow directors. Thereafter, the Board voted to remove Mr. Reinhard from the slate of directors proposed for election at the forthcoming shareholders' meeting, scheduled for May 10, 2007.

7.      By the April 12 press release and subsequent statements, Dow and Mr. Liveris falsely and maliciously defamed Mr. Reinhard's character, thereby injuring his reputation. As defendants well knew or recklessly disregarded, Mr. Reinhard was never part of any effort to take over Dow or put the Company in play, never violated Dow's Code of Business Conduct, and never engaged in inappropriate business activity. Nor did he participate in "multiple meetings in multiple months in multiple locations . . . with a number of different

- 3 -

parties." Rather, defendants used these false charges as a pretext to squelch a knowledgeable and independent voice on the Dow Board.

8.      In this action, Mr. Reinhard seeks to recover for the damage defendants have inflicted on his reputation by reason of these defamatory statements. Mr. Reinhard also seeks to recover from Dow any and all compensation and benefits that have been or will be denied to him on the basis that he breached any obligations owed to Dow or acted improperly, or on account of defendants' libel.

Parties, Jurisdiction and Venue

9.      Mr. Reinhard is a citizen of Brazil and a lawful permanent resident of the United States, domiciled in Florida.

10.     The Dow Chemical Company is a Delaware corporation with its principal place of business in Midland, Michigan. Dow engages in continuous and systematic activities in New York, where the company is qualified to do business. A major Dow facility is located in New York State, as are many of its media advisers, investment bankers, and major customers. Dow executives routinely and systematically travel to New York for industry conferences, analyst meetings, and other business activities. Most of the defamatory statements described below were widely circulated by defendants in New York State and in particular in this district, where the country's major financial newspapers and media are located.

11.     Mr. Liveris is the President, Chairman and Chief Executive Officer of Dow. Upon information and belief, Mr. Liveris is a citizen of Australia and a lawful permanent resident of the United States, domiciled in Michigan. Mr. Liveris engages in continuous and

- 4 -

systematic activities in New York, including but not limited to frequent travel to New York for business and other activities.  Mr. Liveris also serves on the boards of several corporate entities based in New York.

       12.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states.  The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

       13.     Venue is proper in this district under 28 U.S.C. § 1391(a).

Background

Mr. Reinhard's Career at Dow

       14.     Mr. Reinhard has enjoyed an exemplary and highly successful career with Dow.  He spent thirty-seven years as an active executive at the Company serving in a variety of positions of increasing responsibility, with postings at Dow offices around the world.  In 1970, Mr. Reinhard joined Dow's operations in Brazil as an employee in its financial department.  In 1978, after working for several years in Dow's main office in Midland, Michigan and its offices in Florida, Mr. Reinhard became finance director of Dow Brazil.  In 1981, he was appointed finance director of Dow Europe.  In 1985, Mr. Reinhard was named president of Dow's operations in Italy.  By 1988, Mr. Reinhard had returned to Midland to become Dow's Corporate Treasurer.  In 1995, Mr. Reinhard was appointed Chief Financial Officer of the Company.  That same year, he was elected to Dow's Board.  In 1996, Mr. Reinhard was elected to the additional position of Executive Vice President, a position he held until his retirement in 2005.

15.     During his ten-year tenure as Dow's CFO, Mr. Reinhard was twice voted Best CFO in America for the chemicals/commodity industry in *Institutional Investor Magazine*'s annual survey of industry analysts.  In 1995, Mr. Reinhard was appointed to a team of senior executives tasked with devising a strategic plan to transform Dow into a fully integrated chemicals company.  In 2000, Mr. Reinhard was a leading candidate to succeed then-CEO William Stavropoulos.  Despite losing that race to a colleague, Mr. Reinhard chose to remain at Dow as CFO for five more years, until his retirement from active management in 2005.

16.     Mr. Reinhard's integrity, professionalism, and adherence to his fiduciary responsibilities have not previously been called into question.  Moreover, during the last ten years, he has been annually re-nominated by Dow's Governance Committee as a director, having been deemed by the Board to possess the "strong values and discipline" and "high ethical standards" required for Board membership, as set forth in Dow's Corporate Governance Guidelines.

17.     Given his mature and seasoned judgment, intimate knowledge of a board's role, responsibilities, processes and procedures, and high ethical standards, Mr. Reinhard has been highly sought after by, and has served on, the boards of other major public companies.  In total, Mr. Reinhard has approximately twenty-five years of service as a public board director, including service on corporate-governance and other committees.

<u>Mr. Reinhard's Relationship with Mr. Liveris</u>

18.     By 2006, Mr. Liveris simultaneously held the offices of Chairman, CEO, and President.  As such, he exerts significant influence over the Company and its Board.

- 6 -

19.    Of the eight independent directors currently serving on Dow's Board, five have joined the Board in the last six years, and of those, three have joined in the last two years, during Mr. Liveris' tenure as CEO.

20.    Upon information and belief, Mr. Liveris has viewed Mr. Reinhard – who is among Dow's longest-tenured directors, an employee of thirty-seven years experience, and a former CFO – as a hindrance to his influence over the Company, due to the respect Mr. Reinhard commands as an expert in the chemicals industry and his willingness to stand up to Mr. Liveris when he believes it to be in the best interest of Dow's shareholders.

Dow's Termination of Mr. Reinhard

21.    On July 27, 2006, as part of Dow's announcement of its earnings for the fiscal second quarter, the Company lowered its earnings per share estimate for the full year.  That day, the price of Dow shares fell by more than 10 percent.  Soon thereafter, rumors began to circulate that Dow might be a target for a buyout or other effort to acquire all or part of the Company.

22.    On February 25, 2007, the UK newspaper *The Sunday Express* reported that a group of "global investors and American private equity giants" were close to launching a bid for Dow.  On April 8, the same publication reported that a group of investors from the Middle East, together with a group of U.S. private equity firms, were potentially "days away" from a bid.

23.    Using his supposed concern about buyout rumors as a pretext, upon information and belief Mr. Liveris saw an opportunity to eliminate Mr. Reinhard as a Dow employee and independent voice on the Dow Board.

KL3 2591664.2

24.    Dow had regularly scheduled Board meetings on April 11 and 12.  Mr. Reinhard had previously informed Mr. Liveris that he would not be able to attend the April 11 meeting because of a conflict with another Board meeting, but would fly into Midland that night and attend the meeting on April 12.  While Mr. Reinhard was preparing to fly to Midland on the evening of April 11, he received a message from Mr. Liveris' assistant requesting that Mr. Reinhard stop by Mr. Liveris' office at Dow the following morning at 7 a.m., prior to the Board meeting.  As he was not informed of a reason for the meeting with Mr. Liveris, Mr. Reinhard assumed that Mr. Liveris would be briefing him on the prior day's Board sessions.

25.    At approximately 7 a.m. the next day, Mr. Reinhard went to Mr. Liveris' office as requested.  Mr. Liveris immediately told Mr. Reinhard that the Company had concluded he had engaged in "grave" misconduct, including serious breaches of his fiduciary duties, by participating in meetings with financial institutions in furtherance of a takeover or acquisition of Dow.  Mr. Liveris said that as a result of this conduct, the Company intended to fire Mr. Reinhard from his position as a Dow employee. He offered to allow Mr. Reinhard to keep all the financial benefits to which he was entitled by virtue of his service to Dow, without penalty, if Mr. Reinhard tendered his resignation on the spot.

26.    Mr. Reinhard protested and refused to resign.  He told Mr. Liveris unequivocally that he had never breached his fiduciary obligations to Dow, and that the allegations were false.  Mr. Liveris did not provide details of the alleged misconduct; he would only say that he had "received information" that Mr. Reinhard had been a participant in meetings with financial institutions in furtherance of a takeover of Dow.  Shortly thereafter, Mr. Reinhard left the building with Dow security guards following him.  Based on the libelous charges, Dow, with the full support of the Board, then terminated Mr. Reinhard's employment.

- 8 -

27.    Since April 12, Mr. Reinhard has not been permitted to return to Dow's offices, and has been denied access to his email, calendar, rolodex, and all files maintained on his computer at Dow.

The Defamatory Statements

28.    Shortly after the events described above, Dow began widely disseminating a series of defamatory statements deliberately designed to destroy Mr. Reinhard's career and reputation.

29.    On the morning of April 12, Dow issued a press release (Exh. A, attached) containing the following statement:

> The Dow Chemical Company announced this morning that Pedro Reinhard, a senior advisor and member of the Board of Directors, and Romeo Kreinberg, an officer of the Company, engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct. Reinhard and Kreinberg were involved in unauthorized discussions with third parties about the potential acquisition of the Company.
>
> The Company took swift action: information about the misconduct was first disclosed to Dow on Tuesday, April 10; the Board of Directors was informed on Wednesday, April 11; and the employees were terminated this morning with full support of the Board.
>
> "The values of integrity and respect for people are at the very core of our Company," said Andrew Liveris, chairman and CEO. "I think I speak for all employees when I say we are greatly saddened by the disrespect shown by our former colleagues. But we will move on to shape our future with an even greater resolve to execute our strategy and deliver value to our shareholders. We will uphold Dow's 110-year history of commitment to the highest standards of integrity, ethical conduct and corporate governance."

(emphasis added).

- 9 -

30.    As set forth in the Dow press release itself, Dow learned of the supposed misconduct just two days earlier. Dow also admitted later, in an April 13, 2007 article published in the *Saginaw News* concerning these events, that no formal inquiry had led to Mr. Reinhard's public termination, stating through a spokesperson that "I wouldn't call it an investigation." Rather, the Company explained that it had received information from "one individual," who purportedly confirmed Mr. Reinhard's alleged misconduct.

31.    Dow published the press release on its website and also issued the release to the press. The Dow press release received particular attention in the financial press based in New York. For example, a front-page article published on April 13 in *The Wall Street Journal*, headlined "Officials Fired at Dow Chemical for Secret Talks – Two Accused of Seeking Outside Buyout Deal; A Tip from J.P. Morgan," reported on Mr. Reinhard's dismissal and the Company's allegations that he had acted improperly. An April 13 article on the front-page of the business section of *The New York Times* quoted from Dow's press release, and reported that Mr. Reinhard had "held a series of secret meetings with investment bankers and prospective investors" over the previous four months.

32.    On April 12, Dow also posted on its website "An Open Letter to Our Valued Customers," signed by Mr. Liveris (Exh. B, attached), which repeated the statements that Mr. Reinhard had "engaged in unauthorized discussions with third parties about a potential acquisition of the Company," accused him of "misconduct," and explained that he had been fired because of these alleged discussions.

33.    During the following week, Mr. Liveris and Dow made additional statements to the media, including to the financial press based in New York, reiterating and

elaborating upon the allegations in the April 12 press release. For example, the April 13 *Wall Street Journal* article quoted Christopher Huntley, a Dow spokesperson, as saying that Mr. Reinhard had been involved in buyout discussions in "multiple meetings in multiple months in multiple locations," and "with a number of different parties," including more than one investment bank. In comments published in the April 18 issue of the *Financial Times*, Mr. Liveris asserted that "[w]e had irrefutable evidence that this was inappropriate behavior." In response to a question about whether he was confident in the quality of the evidence, Mr. Liveris told the *Financial Times*: "Capital Y, Capital E, Capital S. Yes. Why would we act in any other way? We were absolutely clear."

34.    An April 18 *Bloomberg* article quoted Mr. Liveris as asserting that he had "not a minute of doubt" that Dow had taken "absolutely appropriate action" in firing Mr. Reinhard. The same *Bloomberg* article quoted Mr. Liveris as saying, "How we found out about it is absolutely watertight: Multiple sources, multiple locations, over multiple time frames." Mr. Liveris continued, "Unfortunately for [Mr. Reinhard], [he] made a tragic mistake."

35.    These statements by Dow and Mr. Liveris came after Mr. Reinhard had, on the morning of April 12, unequivocally denied involvement in any buyout or similar effort. Moreover, on April 16, Mr. Reinhard released to the press the following statement:

> I categorically deny that I have been part of any secret effort to take over or acquire Dow Chemical.
>
> It is regrettable that the Company has rushed to publicly condemn me in the face of my complete denial of wrongdoing. I have loyally served this Company for 37 years, including as a director since 1995. My integrity, professionalism, and adherence to my fiduciary responsibilities have never been questioned before.

- 11 -

I have always faithfully complied with my fiduciary duties to Dow.
My conscience is clear.

36.     Despite Mr. Reinhard's statement, defendants continued to defame Mr.
Reinhard publicly.  For example, on or about April 19, 2007, Dow mailed to every Dow
shareholder entitled to vote at the Company's May 10 annual meeting a "Supplement to Notice
of the Annual Meeting and Proxy Statement."  (Exh. C, attached).  The document repeated the
assertion that the Company had "terminated Mr. Reinhard's employment with the Company
because he violated [Dow's] Code of Conduct by engaging in unauthorized discussions with
third parties about the potential acquisition of Dow."  The envelope in which the mailing was
enclosed bore a return address in New York, as follows:  The Dow Chemical Company, c/o The
Bank of New York, PO Box 11002, New York, NY 10286-1002.

37.     All of the aforementioned statements, as well as other statements by Dow
and Mr. Liveris concerning Mr. Reinhard that were published in the New York and national
press during the week following April 12, falsely and maliciously defamed Mr. Reinhard's
character, thereby injuring his reputation, in particular his professional reputation as an ethical
businessman and board member.

Dow's and Mr. Liveris' Statements were False

38.     The statements by Dow and Mr. Liveris are and were false.  In particular,
the statements that Mr. Reinhard has engaged in unauthorized discussions with third parties in
furtherance of a potential acquisition of the Company, and that Mr. Reinhard's conduct was
highly inappropriate and a clear violation of Dow's Code of Business Conduct, are and were
false. The Dow statements that Mr. Reinhard had participated in multiple meetings in multiple
months in multiple locations with a number of different parties in furtherance of such a plan are

likewise false. Mr. Reinhard did not engage in any such unauthorized discussions, nor did he violate the Dow Code of Business Ethics or engage in inappropriate business activity.

39.    Dow and Mr. Liveris continued to publish false, defamatory, and malicious statements about Mr. Reinhard even after Mr. Reinhard had publicly and categorically denied that such allegations were true.

Dow's Termination of Mr. Reinhard

40.    Dow purported to terminate Mr. Reinhard's employment relationship on April 12, 2007. On April 16, the Dow Board voted to remove Mr. Reinhard from the slate of directors nominated for election by the shareholders at the Company's May 10, 2007 annual shareholders' meeting.

41.    Since April 12, 2007, Dow has refused to pay to Mr. Reinhard the compensation and benefits to which he is entitled pursuant to various contracts, plans, policies, and other agreements that are binding upon the Company.

42.    Dow has prevented Mr. Reinhard from accessing his computer at Dow, in which Mr. Reinhard maintains information concerning the compensation and benefits to which he is entitled.

- 13 -

First Claim for Relief Against The Dow Chemical Company and Andrew N. Liveris for Libel:

43.     Mr. Reinhard repeats and realleges the allegations contained in paragraphs 1 through 42 above.

44.     By the statements in Dow's April 12, 2007 press release, and in subsequent statements to Dow's customers, shareholders, the press, and others, Dow and Mr. Liveris have libeled and defamed Mr. Reinhard.

45.     Dow's and Mr. Liveris' statements are libelous per se because the defamatory nature of the statements is apparent on the face of the statements in that they tend to injure or prejudice Mr. Reinhard's professional reputation as an ethical businessman and director.

46.     The defamatory statements in the April 12, 2007 press release, and in subsequent statements to Dow's customers, shareholders, and the press, were false, as set forth in paragraphs 29 through 39 above.

47.     Dow and Mr. Liveris published the defamatory and false statements described in paragraphs 29 through 37 above, to, at a minimum, readers of *The New York Times*, *The Wall Street Journal*, *Financial Times*, *Bloomberg*, and to Dow's customers and shareholders.

48.     Dow and Mr. Liveris published the defamatory and false statements, all of which were of and concerning Mr. Reinhard, with actual malice because they either knew their statements were false, or made the statements with reckless disregard for their truth or falsity. Defendants well knew or recklessly disregarded that Mr. Reinhard did not engage in either "business activity that was highly inappropriate and a clear violation of Dow's Code of Business

- 14 -

Conduct" or "unauthorized discussions with third parties about a potential acquisition of the Company." They also knew or recklessly disregarded the fact that Mr. Reinhard did not participate in multiple meetings, in multiple months, in multiple locations, with a number of different parties, in furtherance of a takeover or acquisition of Dow, or commit any of the other misconduct falsely alleged by defendants.

49.    Dow and Mr. Liveris published the defamatory and false statements intentionally and with common law malice in that they were motivated by hatred, ill will or spite or by a reckless disregard for Mr. Reinhard's rights. Among other things, defendants made these statements in an effort to discredit Mr. Reinhard and squelch his independent voice on the Dow Board.

50.    As a direct and proximate result of the conduct described above, Mr. Reinhard has suffered financial loss and damage to his unblemished professional reputation as an ethical businessman and director.

51.    By reason of the foregoing, Mr. Reinhard demands an award of compensatory in an amount to be determined at trial, but not less than $25 million.

52.    Because defendants' conduct was willful, wanton and reckless, Mr. Reinhard also demands an award of punitive damages in an amount to be determined at trial, but not less than $25 million.

Second Claim for Relief Against The Dow Chemical Company for Breach of Contract:

53.    Mr. Reinhard repeats and realleges the allegations contained in paragraphs 1 through 42 above.

- 15 -

54.     In the course of Mr. Reinhard's employment with Dow, Dow entered into various binding contracts, plans, policies, and other agreements, pursuant to which Dow agreed to pay to Mr. Reinhard compensation and benefits, including without limitation deferred stock, stock options, and pension benefits.

55.     Dow breached such contracts, plans, policies, and other agreements when, following Mr. Reinhard's termination on April 12, 2007, Dow ceased to pay to Mr. Reinhard the compensation and benefits to which he is entitled.

56.     At the time of Dow's breach, Mr. Reinhard had performed, and was ready, willing, and able to continue to perform, all of his obligations under all such contracts, plans, policies, and other agreements.

57.     As a result of Dow's breach, Mr. Reinhard has been damaged in an amount to be determined at trial, but not less than $25 million.

WHEREFORE, Mr. Reinhard respectfully requests judgment as follows:

(i)      On his first claim for relief, an award of compensatory damages in an amount to be determined at trial, but not less than $25 million;

(ii)     On his first claim for relief, punitive damages in an amount to be determined at trial, but not less than $25 million;

(iii)    On his second claim for relief, an award of compensatory damages in an amount to be determined at trial, but not less than $25 million;

(iv)     An award of costs and disbursements, including attorneys' fees; and

- 16 -

(v)    Such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          May 8, 2007

                              Kramer Levin Naftalis & Frankel LLP

                        By:   _____

                              Gary P. Naftalis (GN-5489)
                              Jonathan M. Wagner (JW-7197)
                              Darren A. LaVerne (DL-9502)

                              1177 Avenue of the Americas
                              New York, NY 10036-2714
                              (212) 715-9100

                              *Attorneys for Plaintiff J. Pedro Reinhard*


          Plaintiff demands a trial by jury.

KL3 2591664.1

Exhibit A



# News Center

**The Dow Chemical Company Announces Executive Terminations**

Midland, MI - April 12, 2007

The Dow Chemical Company announced this morning that Pedro Reinhard, a senior advisor and member of the Board of Directors, and Romeo Kreinberg, an officer of the Company, engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct. Reinhard and Kreinberg were involved in unauthorized discussions with third parties about the potential acquisition of the Company.

The Company took swift action: information about the misconduct was first disclosed to Dow on Tuesday, April 10; the Board of Directors was informed on Wednesday, April 11; and the employees were terminated this morning with full support of the Board.

"The values of integrity and respect for people are at the very core of our Company," said Andrew Liveris, chairman and CEO. "I think I speak for all employees when I say we are greatly saddened by the disrespect shown by our former colleagues. But we will move on to shape our future with an even greater resolve to execute our strategy and deliver value to our shareholders. We will uphold Dow's 110-year history of commitment to the highest standards of integrity, ethical conduct and corporate governance."

**About Dow**

Dow is a diversified chemical company that harnesses the power of innovation, science and technology to constantly improve what is essential to human progress. The Company offers a broad range of products and services to customers in more than 175 countries, helping them to provide everything from fresh water, food and pharmaceuticals to paints, packaging and personal care products. Built on a commitment to its principles of sustainability, Dow has annual sales of $49 billion and employs 43,000 people worldwide. References to "Dow" or the "Company" mean The Dow Chemical Company and its consolidated subsidiaries unless otherwise expressly noted.

**For Editorial Information:**

Chris Huntley
The Dow Chemical Company
989-636-2876

Exhibit B

An Open Letter to Our Valued Customers



April 12, 2007

## An Open Letter to Our Valued Customers

As you may have heard, this week we announced the termination of two executives, Pedro Reinhard and Romeo Kreinberg, effective immediately.

You should have full confidence that we remain fully committed to you, our valued customers. We have an outstanding management team that will continue to ensure we maintain an unwavering focus in serving your busir needs and growing with you.

Dow will shape its future with even greater resolve to execute our strategy and deliver value to our customers and shareholders. You can and should continue to count on us as a committed business partner with a commitment to highest standards.

When it was recently brought to Dow's attention that Mr. Reinhard, a senior advisor and member of the Board of Directors, and Mr. Kreinberg, an officer of the Company, engaged in unauthorized discussions with third parties at a potential acquisition of the Company, Dow moved quickly. Information about the misconduct was first disclosed t Dow on Tuesday, April 10; the Board of Directors was informed on Wednesday, April 11; and the employees were terminated Thursday, April 12, with full support of the Board.

The Dow Chemical Company is committed to providing excellent value to our customers. We believe integrity, eth conduct and respect for people are the very bedrock of our service promise.

Sincerely,

Andrew N. Liveris
Chairman and CEO

Exhibit C



**The Dow Chemical Company**
Midland, Michigan 48674

## Supplement to Notice of the Annual Meeting and Proxy Statement

**Annual Meeting**

This Supplement provides updated information with respect to the 2007 Annual Meeting of Stockholders of The Dow Chemical Company (the "Meeting") to be held on Thursday, May 10, 2007, at 10:00 a.m., Eastern Daylight Time, at the Midland Center for the Arts, 1801 West St. Andrews, Midland, Michigan, for the purposes set forth in the Notice of the Annual Meeting of Stockholders dated March 23, 2007 (the "Notice").

The Notice, proxy statement dated March 23, 2007 (the "Proxy Statement") and proxy voting form were mailed on or about March 23, 2007 to all stockholders entitled to vote at the Meeting. This Supplement is being mailed on or about April 19, 2007 to all stockholders entitled to vote at the Meeting. Except as specifically amended or supplemented by the information contained in this Supplement, all information set forth in the Proxy Statement remains accurate and should be considered in voting your shares.

**Change in Candidates Nominated by the Board of Directors for Election as Directors at the Meeting**

Your Board of Directors, acting upon the recommendation of the Governance Committee of the Board of Directors, has authorized a revised slate of nominees for election to the Company's Board of Directors at the Meeting. As discussed further below, the revised list of nominees approved by the Board of Directors comprises each of the current Directors other than Mr. J. Pedro Reinhard. Further information on the eleven (11) nominees is provided below and in the Proxy Statement. In addition, upon the recommendation of the Governance Committee, the Board of Directors approved reducing the size of the Company's Board of Directors to eleven (11) directors, from the current twelve (12) directors, effective as of the Meeting.

This Supplement does not modify, amend, supplement or otherwise affect any matter presented for consideration in the Proxy Statement other than the election of directors.

**Voting; Revocability of Proxies**

**If you have already returned your proxy voting form, you do not need to submit a new form unless you wish to change your vote.** Proxy voting forms already returned by stockholders will remain valid and will be voted at the Meeting unless revoked. Shares represented by proxy voting forms returned before the Meeting will be voted for the Directors nominated by the Board of Directors as instructed on the form, except that votes will not be cast for Mr. Reinhard because he is no longer nominated by the Board of Directors.

If you have not yet returned your proxy voting form, please vote as soon as possible. You may use the proxy voting form enclosed with this Supplement, which reflects the revised nominees of the Board of Directors. Stockholders may revoke any previously delivered voting proxy at any time before it is voted at the Meeting by sending a written revocation, by submitting another proxy voting form with a later date, by attending the Meeting and voting in person or, in the case of stockholders whose shares are voted through a bank or broker, by contacting the bank or brokerage firm.

## Election of Directors

Agenda Item 1 for the Meeting consists of the election of Directors, to serve for a one-year term that expires at the Annual Meeting in 2008, and until their successors are elected and qualified. The candidates nominated by the Board of Directors consist of all of the nominees identified in the Proxy Statement, with the exception of Mr. J. Pedro Reinhard. On April 12, 2007, we announced that we had terminated Mr. Reinhard's employment with the Company because he violated our Code of Conduct by engaging in unauthorized discussions with third parties about the potential acquisition of Dow. Because Mr. Reinhard is no longer nominated to serve as a Director, shares represented by proxy voting forms received by the Company will be voted for the remaining eleven nominees as instructed on the form and will not be voted for Mr. Reinhard. The following are the Board of Directors' nominees for election as Directors:

| Name | Director Since |
|------|----------------|
| Arnold A. Allemang | 1996 |
| Jacqueline K. Barton | 1993 |
| James A. Bell | 2005 |
| Jeff M. Fettig | 2003 |
| Barbara Hackman Franklin | 1980-1992; 1993 |
| John B. Hess | 2006 |
| Andrew N. Liveris | 2004 |
| Geoffery E. Merszei | 2005 |
| James M. Ringler | 2001 |
| Ruth G. Shaw | 2005 |
| Paul G. Stern | 1992 |

Biographical information with respect to all nominees and share ownership information with respect to all nominees is set forth in the Proxy Statement under the captions "CANDIDATES FOR ELECTION AS DIRECTOR" and "BENEFICIAL OWNERSHIP OF COMPANY STOCK".

## Other Matters

None of the other agenda items presented in the Proxy Statement are affected by this Supplement, and you should carefully review the Proxy Statement prior to voting your shares. The Company knows of no matters to be submitted to the Meeting other than those presented in the Proxy Statement, as amended and supplemented by this Supplement. If any other matters properly come before the Meeting, it is the intention of the persons named in the enclosed proxy voting form to vote the shares they represent in accordance with their best judgment on each of such matters.

BY ORDER OF THE BOARD OF DIRECTORS

Charles J. Kalil
Senior Vice President,
General Counsel and Corporate Secretary

Midland, Michigan
April 19, 2007