# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J. PEDRO REINHARD, | Case No. 07-CV-3641 (RPP) |
| Plaintiff, | ECF Case |
| -against- | **DEFENDANT THE DOW CHEMICAL COMPANY'S ANSWER, COUNTERCLAIM, AND DEMAND FOR JURY TRIAL** |
| THE DOW CHEMICAL COMPANY AND ANDREW N. LIVERIS, | |
| Defendants. | |

This action centers on Pedro Reinhard's serious breaches of his contracts with, and fiduciary duties to, The Dow Chemical Company ("Dow" or the "Company"), and the Company's subsequent statements about its proper termination of Reinhard's employment due to his misconduct.

Defendant The Dow Chemical Company hereby sets forth its Answer and Counterclaim to the Complaint of Plaintiff J. Pedro Reinhard. All statements of which Dow does not have personal knowledge are upon information and belief.

## REINHARD COMPLAINT

1.    This is an action for libel and breach of contract. Mr. Reinhard has devoted his entire professional life to Dow, rising through the ranks over the course of a distinguished thirty-seven year career to become its Chief Financial Officer and a member of its Board of Directors. Along the way, Mr. Reinhard earned a reputation for honesty, integrity, loyalty, and commitment to the success of the Company and the welfare of its shareholders. After he retired from active management in 2005 at the age of sixty, and in recognition of his reputation, experience, knowledge, and skill, Mr. Reinhard was invited to continue to serve as a member of the Dow Board. Mr. Reinhard has also served with distinction for over six years as a member of the Boards of Directors of several other major public companies.

Case 1:07-cv-03641-RPP    Document 4    Filed 05/29/2007    Page 2 of 44

**DOW ANSWER**: Dow admits that Plaintiff Reinhard attempts to bring claims for libel and breach of contract, but denies that it has engaged in any acts or omissions in this state or any other state that would entitle Plaintiff to any relief whatsoever under state or federal law and further denies that Plaintiff is entitled to any relief whatsoever. Dow further admits that Reinhard became its Chief Financial Officer and a member of its Board of Directors, and that Reinhard continued to serve on the Board of Directors after retiring from active management in 2005. Dow is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 1 of the Complaint, and therefore denies them.

**REINHARD COMPLAINT**

2.     On the morning of April 12, 2007, prior to a regularly scheduled meeting of the Dow Board, Mr. Reinhard was summoned to the office of Andrew N. Liveris, Dow's President, Chairman, and Chief Executive Officer. Mr. Liveris told Mr. Reinhard that the Company had concluded that he had engaged in "grave" misconduct, including serious breaches of his fiduciary duties, by participating in meetings with financial institutions in furtherance of a takeover or acquisition of Dow. Mr. Liveris declared that the Company intended to fire Mr. Reinhard from his position at Dow. He offered to allow Mr. Reinhard to keep all financial benefits to which he was entitled by virtue of his service to Dow, without penalty, if he tendered his resignation on the spot.

**DOW ANSWER**: Dow admits that at a meeting on April 12, 2007, Reinhard was told that the Company had concluded that he had violated his fundamental duties to Dow, including his fiduciary obligations to Dow and its shareholders. Dow denies the remaining allegations of Paragraph 2 of the Complaint.

**REINHARD COMPLAINT**

3.     Because Mr. Liveris' and Dow's charges were completely false, Mr. Reinhard protested that he did not breach any fiduciary duties and refused to resign. Mr. Liveris did not provide details of the alleged misconduct; he would only say that he had "received information" that Mr. Reinhard had been a participant in meetings with financial institutions in furtherance of a takeover of Dow. Shortly thereafter, Mr. Reinhard left the building with Dow security guards following him.

**DOW ANSWER**: Dow denies the allegations in Paragraph 3 of the Complaint.

**REINHARD COMPLAINT**

4.    Later that morning, Dow issued a press release widely disseminated in the financial press and elsewhere, stating that Mr. Reinhard had "engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct." The press release further asserted that Mr. Reinhard had been "involved in unauthorized discussions with third parties about the potential acquisition of [Dow]," and quoted Mr. Liveris as saying "we are greatly saddened by the disrespect shown by our former colleagues." The press release reported that Dow had learned "information about the misconduct" just two days earlier, on April 10. The press release also reported that Dow had terminated Mr. Reinhard with the full support of the Board, based on the libelous charges. In a Wall Street Journal article the next day, a Dow spokesperson was quoted as saying that Mr. Reinhard had engaged in "multiple meetings in multiple months in multiple locations" and "with a number of different parties," including more than one investment bank.

**DOW ANSWER:** Dow admits that on April 12, 2007 it released a statement to

the press. Insofar as the allegations of Paragraph 4 of the Complaint refer to the contents of

other documents, those documents speak for themselves. Dow denies the remaining allegations

of Paragraph 4 of the Complaint.

**REINHARD COMPLAINT**

5.    During the following week, Mr. Liveris and a Dow spokesperson repeated and underscored these false allegations in statements published in The Wall Street Journal, The New York Times, Financial Times and other major newspapers and media outlets, claiming among other things that the evidence against Mr. Reinhard was "irrefutable," that the sources of the evidence were "absolutely watertight," and that Mr. Reinhard had "made a tragic mistake." These statements were published after Mr. Reinhard had issued, on April 16, a public statement categorically denying defendants' charges.

**DOW ANSWER:** Dow admits that Dow and Mr. Liveris made statements

concerning the matter and that Reinhard issued a press release. Dow denies that the statements

were false. Insofar as the allegations in Paragraph 5 refer to the contents of other documents,

those documents speak for themselves. Dow denies the remaining allegations in Paragraph 5 of

the Complaint.

**REINHARD COMPLAINT**

6.    On April 16, 2007, the Dow Board held a meeting, at which Mr. Reinhard read his public statement to the Dow directors. Thereafter, the Board voted to remove Mr. Reinhard

from the slate of directors proposed for election at the forthcoming shareholders' meeting, scheduled for May 10, 2007.

**DOW ANSWER:** Dow admits that at the meeting of the Dow Board of Directors on April 16, 2007, Reinhard read a statement and that the Dow Board approved a revised slate of directors for election at the May 10, 2007 shareholders' meeting that did not include Reinhard. Dow denies the remaining allegations in Paragraph 6 of the Complaint.

## REINHARD COMPLAINT

7.    By the April 12 press release and subsequent statements, Dow and Mr. Liveris falsely and maliciously defamed Mr. Reinhard's character, thereby injuring his reputation. As defendants well knew or recklessly disregarded, Mr. Reinhard was never part of any effort to take over Dow or put the Company in play, never violated Dow's Code of Business Conduct, and never engaged in inappropriate business activity. Nor did he participate in "multiple meetings in multiple months in multiple locations . . . with a number of different -3- parties." Rather, defendants used these false charges as a pretext to squelch a knowledgeable and independent voice on the Dow Board.

**DOW ANSWER:** Dow denies the allegations in Paragraph 7 of the Complaint.

## REINHARD COMPLAINT

8.    In this action, Mr. Reinhard seeks to recover for the damage defendants have inflicted on his reputation by reason of these defamatory statements. Mr. Reinhard also seeks to recover from Dow any and all compensation and benefits that have been or will be denied to him on the basis that he breached any obligations owed to Dow or acted improperly, or on account of defendants' libel.

**DOW ANSWER:** Dow admits that Reinhard seeks to "recover damages" in this action, but Dow denies that it has engaged in any acts or omissions in this state or any other state that would entitle Plaintiff to any relief whatsoever under state or federal law and further denies that Plaintiff is entitled to any relief whatsoever. Dow denies that the statements were defamatory and denies all other remaining allegations in Paragraph 8 of the Complaint.

## REINHARD COMPLAINT

9.    Mr. Reinhard is a citizen of Brazil and a lawful permanent resident of the United States, domiciled in Florida.

**DOW ANSWER:** Dow admits that Reinhard is domiciled in Florida. Dow is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9 of the Complaint, and therefore denies them.

## REINHARD COMPLAINT

10.     The Dow Chemical Company is a Delaware corporation with its principal place of business in Midland, Michigan. Dow engages in continuous and systematic activities in New York, where the company is qualified to do business. A major Dow facility is located in New York State, as are many of its media advisers, investment bankers, and major customers. Dow executives routinely and systematically travel to New York for industry conferences, analyst meetings, and other business activities. Most of the defamatory statements described below were widely circulated by defendants in New York State and in particular in this district, where the country's major financial newspapers and media are located.

**DOW ANSWER:** Dow admits that it is a Delaware corporation with its principal place of business in Midland, Michigan; a subsidiary of a Dow subsidiary has a facility in New York State, outside this judicial district; Dow employs bankers and advisers in New York; Dow has customers in New York; and Dow executives travel to New York for business. Dow denies the remaining allegations of Paragraph 10 of the Complaint.

## REINHARD COMPLAINT

11.     Mr. Liveris is the President, Chairman and Chief Executive Officer of Dow. Upon information and belief, Mr. Liveris is a citizen of Australia and a lawful permanent resident of the United States, domiciled in Michigan. Mr. Liveris engages in continuous and systematic activities in New York, including but not limited to frequent travel to New York for business and other activities. Mr. Liveris also serves on the boards of several corporate entities based in New York.

**DOW ANSWER:** Dow admits that Mr. Liveris is the President, Chairman, and Chief Executive Officer of Dow and that Mr. Liveris is a citizen of Australia and a lawful permanent resident of the United States, domiciled in Michigan. Dow further admits that Mr. Liveris travels to New York for business, but denies that Mr. Liveris engages in continuous and systematic activities in New York. Dow denies the remaining allegations in Paragraph 11 of the Complaint.

5

**REINHARD COMPLAINT**

12.     The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

**DOW ANSWER:** Dow admits the allegations in Paragraph 12 of the Complaint.

**REINHARD COMPLAINT**

13.     Venue is proper in this district under 28 U.S.C. § 1391(a).

**DOW ANSWER:** Dow denies the allegations in Paragraph 13 of the Complaint.

**REINHARD COMPLAINT**

14.     Mr. Reinhard has enjoyed an exemplary and highly successful career with Dow. He spent thirty-seven years as an active executive at the Company serving in a variety of positions of increasing responsibility, with postings at Dow offices around the world. In 1970, Mr. Reinhard joined Dow's operations in Brazil as an employee in its financial department. In 1978, after working for several years in Dow's main office in Midland, Michigan and its offices in Florida, Mr. Reinhard became finance director of Dow Brazil. In 1981, he was appointed finance director of Dow Europe. In 1985, Mr. Reinhard was named president of Dow's operations in Italy. By 1988, Mr. Reinhard had returned to Midland to become Dow's Corporate Treasurer. In 1995, Mr. Reinhard was appointed Chief Financial Officer of the Company. That same year, he was elected to Dow's Board. In 1996, Mr. Reinhard was elected to the additional position of Executive Vice President, a position he held until his retirement in 2005.

**DOW ANSWER:** Dow admits that in 1970, Reinhard joined Dow's operations

in Brazil in its financial department; in 1978, Reinhard became finance director of Dow Brazil;

in 1981, he was appointed finance director of Dow Europe; in 1985, Reinhard was named

managing director of Dow in Italy; in 1988, Reinhard became treasurer of Dow; in 1995,

Reinhard was elected financial vice president and chief financial officer of the Company; also in

1995, Reinhard was elected to Dow's Board of Directors; in 1996, Reinhard was elected

executive vice president; Reinhard retired as chief financial officer effective October 1, 2005 and

retired as an executive vice president effective December 31, 2005, though he retained his

position as an employee director on Dow's Board of Directors until May 10, 2007. Dow denies

the remaining allegations in Paragraph 14 of the Complaint.

**REINHARD COMPLAINT**

15.     During his ten-year tenure as Dow's CFO, Mr. Reinhard was twice voted Best CFO in America for the chemicals/commodity industry in Institutional Investor Magazine's annual survey of industry analysts. In 1995, Mr. Reinhard was appointed to a team of senior executives tasked with devising a strategic plan to transform Dow into a fully integrated chemicals company. In 2000, Mr. Reinhard was a leading candidate to succeed then-CEO William Stavropoulos. Despite losing that race to a colleague, Mr. Reinhard chose to remain at Dow as CFO for five more years, until his retirement from active management in 2005.

**DOW ANSWER:** Dow admits the allegations in Paragraph 15 of the Complaint.

**REINHARD COMPLAINT**

16.     Mr. Reinhard's integrity, professionalism, and adherence to his fiduciary responsibilities have not previously been called into question. Moreover, during the last ten years, he has been annually re-nominated by Dow's Governance Committee as a director, having been deemed by the Board to possess the "strong values and discipline" and "high ethical standards" required for Board membership, as set forth in Dow's Corporate Governance Guidelines.

**DOW ANSWER:** Dow denies the allegations in Paragraph 16 of the Complaint.

**REINHARD COMPLAINT**

17.     Given his mature and seasoned judgment, intimate knowledge of a board's role, responsibilities, processes and procedures, and high ethical standards, Mr. Reinhard has been highly sought after by, and has served on, the boards of other major public companies. In total, Mr. Reinhard has approximately twenty-five years of service as a public board director, including service on corporate-governance and other committees.

**DOW ANSWER:** Dow is without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 17 of the Complaint, and therefore denies

them.

**REINHARD COMPLAINT**

18.     By 2006, Mr. Liveris simultaneously held the offices of Chairman, CEO, and President. As such, he exerts significant influence over the Company and its Board.

**DOW ANSWER:** Dow admits that by 2006 Mr. Liveris was its Chairman, CEO,

and President and that Liveris is responsible for leading the Company in consultation with the

Board and other senior management. Dow denies the remaining allegations of Paragraph 18 of

the Complaint.

**REINHARD COMPLAINT**

19.    Of the eight independent directors currently serving on Dow's Board, five have
joined the Board in the last six years, and of those, three have joined in the last two years, during
Mr. Liveris' tenure as CEO.

   **DOW ANSWER:** Dow admits the allegations in Paragraph 19 of the Complaint.

**REINHARD COMPLAINT**

20.    Upon information and belief, Mr. Liveris has viewed Mr. Reinhard – who is
among Dow's longest-tenured directors, an employee of thirty-seven years experience, and a
former CFO – as a hindrance to his influence over the Company, due to the respect Mr. Reinhard
commands as an expert in the chemicals industry and his willingness to stand up to Mr. Liveris
when he believes it to be in the best interest of Dow's shareholders.

   **DOW ANSWER:** Dow denies the allegations in Paragraph 20 of the Complaint.

**REINHARD COMPLAINT**

21.    On July 27, 2006, as part of Dow's announcement of its earnings for the fiscal
second quarter, the Company lowered its earnings per share estimate for the full year. That day,
the price of Dow shares fell by more than 10 percent. Soon thereafter, rumors began to circulate
that Dow might be a target for a buyout or other effort to acquire all or part of the Company.

   **DOW ANSWER:** Dow admits that on July 27, 2006 it announced its earnings

for the second quarter of its fiscal year and that Dow's stock price closed at $37.28 on July 26,

2006 and at $33.54 on July 27, 2007. Dow is without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations of Paragraph 21 of the Complaint, and

therefore denies them.

**REINHARD COMPLAINT**

22.    On February 25, 2007, the UK newspaper The Sunday Express reported that a
group of "global investors and American private equity giants" were close to launching a bid for
Dow. On April 8, the same publication reported that a group of investors from the Middle East,
together with a group of U.S. private equity firms, were potentially "days away" from a bid.

8

**DOW ANSWER:** Insofar as the allegations of Paragraph 22 refer to the contents

of other documents, those documents speak for themselves. Dow denies the remaining

allegations of Paragraph 22 of the Complaint.

**REINHARD COMPLAINT**

23.    Using his supposed concern about buyout rumors as a pretext, upon information
and belief Mr. Liveris saw an opportunity to eliminate Mr. Reinhard as a Dow employee and
independent voice on the Dow Board.

**DOW ANSWER:** Dow denies the allegations of Paragraph 23 of the Complaint.

**REINHARD COMPLAINT**

24.    Dow had regularly scheduled Board meetings on April 11 and 12. Mr. Reinhard
had previously informed Mr. Liveris that he would not be able to attend the April 11 meeting
because of a conflict with another Board meeting, but would fly into Midland that night and
attend the meeting on April 12. While Mr. Reinhard was preparing to fly to Midland on the
evening of April 11, he received a message from Mr. Liveris' assistant requesting that Mr.
Reinhard stop by Mr. Liveris' office at Dow the following morning at 7 a.m., prior to the Board
meeting. As he was not informed of a reason for the meeting with Mr. Liveris, Mr. Reinhard
assumed that Mr. Liveris would be briefing him on the prior day's Board sessions.

**DOW ANSWER:** Dow admits that it had a regularly scheduled Board meeting

on April 11 and 12, 2007; and Reinhard was asked to meet at Dow on the morning of April 12,

2007, before that day's Board meeting. Dow is without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 24 of the Complaint and

therefore denies them.

**REINHARD COMPLAINT**

25.    At approximately 7 a.m. the next day, Mr. Reinhard went to Mr. Liveris' office as
requested. Mr. Liveris immediately told Mr. Reinhard that the Company had concluded he had
engaged in "grave" misconduct, including serious breaches of his fiduciary duties, by
participating in meetings with financial institutions in furtherance of a takeover or acquisition of
Dow. Mr. Liveris said that as a result of this conduct, the Company intended to fire Mr. Reinhard
from his position as a Dow employee. He offered to allow Mr. Reinhard to keep all the financial
benefits to which he was entitled by virtue of his service to Dow, without penalty, if Mr.
Reinhard tendered his resignation on the spot.

**DOW ANSWER:** Dow admits that at a meeting on April 12, 2007, Reinhard

was told that the Company had concluded that he had violated his fundamental duties to Dow,

including his fiduciary obligations to Dow and its shareholders. Dow denies the remaining

allegations of Paragraph 25 of the Complaint.

## REINHARD COMPLAINT

26.    Mr. Reinhard protested and refused to resign. He told Mr. Liveris unequivocally
that he had never breached his fiduciary obligations to Dow, and that the allegations were false.
Mr. Liveris did not provide details of the alleged misconduct; he would only say that he had
"received information" that Mr. Reinhard had been a participant in meetings with financial
institutions in furtherance of a takeover of Dow. Shortly thereafter, Mr. Reinhard left the
building with Dow security guards following him. Based on the libelous charges, Dow, with the
full support of the Board, then terminated Mr. Reinhard's employment.

**DOW ANSWER:** Dow admits that Reinhard refused to resign, denied breaching

his fiduciary duties, and denied that he had participated in discussions with third parties about a

potential acquisition of the Company. Dow admits that with the full support of its Board of

Directors, Dow terminated Reinhard's employment. Dow denies the remaining allegations in

Paragraph 26.

## REINHARD COMPLAINT

27.    Since April 12, Mr. Reinhard has not been permitted to return to Dow's offices,
and has been denied access to his email, calendar, rolodex, and all files maintained on his
computer at Dow.

**DOW ANSWER:** Dow denies that Reinhard has not been permitted to return to

Dow's offices. Reinhard's personal records have been returned. Dow admits the remaining

allegations in Paragraph 27 of the Complaint.

## REINHARD COMPLAINT

28.    Shortly after the events described above, Dow began widely disseminating a
series of defamatory statements deliberately designed to destroy Mr. Reinhard's career and
reputation.

**DOW ANSWER:** Dow denies the allegations in Paragraph 28 of the Complaint.

10

## REINHARD COMPLAINT

29.     On the morning of April 12, Dow issued a press release (Exh. A, attached) containing the following statement:

> The Dow Chemical Company announced this morning that Pedro Reinhard, a senior advisor and member of the Board of Directors, and Romeo Kreinberg, an officer of the Company, engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct. Reinhard and Kreinberg were involved in unauthorized discussions with third parties about the potential acquisition of the Company.
>
> The Company took swift action: information about the misconduct was first disclosed to Dow on Tuesday, April 10; the Board of Directors was informed on Wednesday, April 11; and the employees were terminated this morning with full support of the Board.
>
> "The values of integrity and respect for people are at the very core of our Company," said Andrew Liveris, chairman and CEO. "I think I speak for all employees when I say we are greatly saddened by the disrespect shown by our former colleagues. But we will move on to shape our future with an even greater resolve to execute our strategy and deliver value to our shareholders. We will uphold Dow's 110-year history of commitment to the highest standards of integrity, ethical conduct and corporate governance."

(emphasis added).

**DOW ANSWER:** Dow admits that on April 12, 2007 it issued a press release, but Dow denies that portions of the press release were underscored or emphasized as set forth.

Insofar as the allegations of Paragraph 29 of the Complaint refer to the contents of other documents, those documents speak for themselves.

## REINHARD COMPLAINT

30.     As set forth in the Dow press release itself, Dow learned of the supposed misconduct just two days earlier. Dow also admitted later, in an April 13, 2007 article published in the *Saginaw News* concerning these events, that no formal inquiry had led to Mr. Reinhard's public termination, stating through a spokesperson that "I wouldn't call it an investigation." Rather, the Company explained that it had received information from "one individual," who purportedly confirmed Mr. Reinhard's alleged misconduct.

**DOW ANSWER:** Dow admits that the *Saginaw News* published an article on April 13, 2007. Insofar as the allegations of Paragraph 30 refer to the contents of other

11

documents, those documents speak for themselves. Dow denies the remaining allegations in

Paragraph 30 of the Complaint.

## REINHARD COMPLAINT

31.    Dow published the press release on its website and also issued the release to the
press. The Dow press release received particular attention in the financial press based in New
York. For example, a front-page article published on April 13 in *The Wall Street Journal*,
headlined "Officials Fired at Dow Chemical for Secret Talks – Two Accused of Seeking Outside
Buyout Deal; A Tip from J.P. Morgan," reported on Mr. Reinhard's dismissal and the
Company's allegations that he had acted improperly. An April 13 article on the front-page of the
business section of *The New York Times* quoted from Dow's press release, and reported that Mr.
Reinhard had "held a series of secret meetings with investment bankers and prospective
investors" over the previous four months.

**DOW ANSWER:** Dow admits that it published its press release on its website

and issued the release to the press; *The Wall Street Journal* published an article on April 13,

2007 with the title attributed to it in Paragraph 31 of the Complaint; and *The New York Times*

published an article on April 13, 2007. Insofar as the allegations of Paragraph 31 refer to the

contents of other documents, those documents speak for themselves. Dow denies the remaining

allegations in Paragraph 31 of the Complaint.

## REINHARD COMPLAINT

32.    On April 12, Dow also posted on its website "An Open Letter to Our Valued
Customers," signed by Mr. Liveris (Exh. B, attached), which repeated the statements that Mr.
Reinhard had "engaged in unauthorized discussions with third parties about a potential
acquisition of the Company," accused him of "misconduct," and explained that he had been fired
because of these alleged discussions.

**DOW ANSWER:** Dow admits that the Open Letter was posted on its website on

April 12, 2007. Dow respectfully refers the Court to the Open Letter, attached as Exhibit B to

the Complaint, and admits only that the documents speaks for itself. Dow denies the remaining

allegations in Paragraph 32 of the Complaint.

12

**REINHARD COMPLAINT**

33.     During the following week, Mr. Liveris and Dow made additional statements to the media, including to the financial press based in New York, reiterating and elaborating upon the allegations in the April 12 press release. For example, the April 13 *Wall Street Journal* article quoted Christopher Huntley, a Dow spokesperson, as saying that Mr. Reinhard had been involved in buyout discussions in "multiple meetings in multiple months in multiple locations," and "with a number of different parties," including more than one investment bank. In comments published in the April 18 issue of the *Financial Times*, Mr. Liveris asserted that "[w]e had irrefutable evidence that this was inappropriate behavior." In response to a question about whether he was confident in the quality of the evidence, Mr. Liveris told the *Financial Times*: "Capital Y, Capital E, Capital S. Yes. Why would we act in any other way? We were absolutely clear."

**DOW ANSWER:** Dow admits that *The Wall Street Journal* published an article on April 13, 2007 and that the *Financial Times* published an article on April 18, 2007. Insofar as the allegations of Paragraph 33 of the Complaint refer to the contents of other documents, those documents speak for themselves. Dow denies the remaining allegations in Paragraph 33 of the Complaint.

**REINHARD COMPLAINT**

34.     An April 18 Bloomberg article quoted Mr. Liveris as asserting that he had "not a minute of doubt" that Dow had taken "absolutely appropriate action" in firing Mr. Reinhard. The same *Bloomberg* article quoted Mr. Liveris as saying, "How we found out about it is absolutely watertight: Multiple sources, multiple locations, over multiple time frames." Mr. Liveris continued, "Unfortunately for [Mr. Reinhard], [he] made a tragic mistake."

**DOW ANSWER:** Dow admits that a *Bloomberg* article was published on April 18, 2007. Insofar as the allegations of Paragraph 34 of the Complaint refer to the contents of other documents, those documents speak for themselves. Dow denies the remaining allegations in Paragraph 34 of the Complaint.

**REINHARD COMPLAINT**

35.     These statements by Dow and Mr. Liveris came after Mr. Reinhard had, on the morning of April 12, unequivocally denied involvement in any buyout or similar effort. Moreover, on April 16, Mr. Reinhard released to the press the following statement:

I categorically deny that I have been part of any secret effort to take over or acquire Dow Chemical.

It is regrettable that the Company has rushed to publicly condemn me in the face of my complete denial of wrongdoing. I have loyally served this Company for 37 years, including as a director since 1995. My integrity, professionalism, and adherence to my fiduciary responsibilities have never been questioned before. I have always faithfully complied with my fiduciary duties to Dow. My conscience is clear.

**DOW ANSWER:** Dow admits that Plaintiff Reinhard released a statement to the press on April 16, 2007. Dow denies the remaining allegations in Paragraph 35 of the Complaint.

## REINHARD COMPLAINT

36. Despite Mr. Reinhard's statement, defendants continued to defame Mr. Reinhard publicly. For example, on or about April 19, 2007, Dow mailed to every Dow shareholder entitled to vote at the Company's May 10 annual meeting a "Supplement to Notice of the Annual Meeting and Proxy Statement." (Exh. C, attached). The document repeated the assertion that the Company had "terminated Mr. Reinhard's employment with the Company because he violated [Dow's] Code of Conduct by engaging in unauthorized discussions with third parties about the potential acquisition of Dow." The envelope in which the mailing was enclosed bore a return address in New York, as follows: The Dow Chemical Company, c/o The Bank of New York, PO Box 11002, New York, NY 10286-1002.

**DOW ANSWER:** Dow admits that it sent to its shareholders the Supplement to Notice of the Annual Meeting and Proxy Statement. Insofar as the allegations of Paragraph 36 of the Complaint refer to the contents of other documents, those documents speak for themselves. Dow denies the remaining allegations of Paragraph 36 of the Complaint.

## REINHARD COMPLAINT

37. All of the aforementioned statements, as well as other statements by Dow and Mr. Liveris concerning Mr. Reinhard that were published in the New York and national press during the week following April 12, falsely and maliciously defamed Mr. Reinhard's character, thereby injuring his reputation, in particular his professional reputation as an ethical businessman and board member.

**DOW ANSWER:** Dow denies the allegations in Paragraph 37 of the Complaint.

14

**REINHARD COMPLAINT**

38.    The statements by Dow and Mr. Liveris are and were false. In particular, the statements that Mr. Reinhard has engaged in unauthorized discussions with third parties in furtherance of a potential acquisition of the Company, and that Mr. Reinhard's conduct was highly inappropriate and a clear violation of Dow's Code of Business Conduct, are and were false. The Dow statements that Mr. Reinhard had participated in multiple meetings in multiple months in multiple locations with a number of different parties in furtherance of such a plan are likewise false. Mr. Reinhard did not engage in any such unauthorized discussions, nor did he violate the Dow Code of Business Ethics or engage in inappropriate business activity.

**DOW ANSWER:** Dow denies the allegations in Paragraph 38 of the Complaint.

**REINHARD COMPLAINT**

39.    Dow and Mr. Liveris continued to publish false, defamatory, and malicious statements about Mr. Reinhard even after Mr. Reinhard had publicly and categorically denied that such allegations were true.

**DOW ANSWER:** Dow denies the allegations in Paragraph 39 of the Complaint.

**REINHARD COMPLAINT**

40.    Dow purported to terminate Mr. Reinhard's employment relationship on April 12, 2007. On April 16, the Dow Board voted to remove Mr. Reinhard from the slate of directors nominated for election by the shareholders at the Company's May 10, 2007 annual shareholders' meeting.

**DOW ANSWER:** Dow admits that it terminated Reinhard's employment on

April 12, 2007, and that the Dow Board of Directors voted to approve a revised slate of directors

nominated for election that did not include Mr. Reinhard. Dow denies the remaining allegations

of Paragraph 40 of the Complaint.

**REINHARD COMPLAINT**

41.    Since April 12, 2007, Dow has refused to pay to Mr. Reinhard the compensation and benefits to which he is entitled pursuant to various contracts, plans, policies, and other agreements that are binding upon the Company.

**DOW ANSWER:** Dow admits that it has not paid Reinhard since April 12,

2007, but denies that he is entitled to this compensation and benefits. Dow denies the remaining

allegations of Paragraph 41 of the Complaint.

15

**REINHARD COMPLAINT**

42.    Dow has prevented Mr. Reinhard from accessing his computer at Dow, in which Mr. Reinhard maintains information concerning the compensation and benefits to which he is entitled.

**DOW ANSWER:** Dow admits that since April 13, 2007 it has prevented Mr.

Reinhard from accessing company computers at Dow to preserve information and potential

relevant evidence anticipated in litigation, but is without knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 42 of the Complaint, and

therefore denies them.

**REINHARD COMPLAINT**

43.    Mr. Reinhard repeats and realleges the allegations contained in paragraphs 1 through 42 above.

**DOW ANSWER:** Dow incorporates its answer to Paragraphs 1-42 in its answer

to Paragraph 43 of the Complaint.

**REINHARD COMPLAINT**

44.    By the statements in Dow's April 12, 2007 press release, and in subsequent statements to Dow's customers, shareholders, the press, and others, Dow and Mr. Liveris have libeled and defamed Mr. Reinhard.

**DOW ANSWER:** Dow denies the allegations in Paragraph 44 of the Complaint.

**REINHARD COMPLAINT**

45.    Dow's and Mr. Liveris' statements are libelous per se because the defamatory nature of the statements is apparent on the face of the statements in that they tend to injure or prejudice Mr. Reinhard's professional reputation as an ethical businessman and director.

**DOW ANSWER:** Dow denies the allegations in Paragraph 45 of the Complaint.

**REINHARD COMPLAINT**

46.    The defamatory statements in the April 12, 2007 press release, and in subsequent statements to Dow's customers, shareholders, and the press, were false, as set forth in paragraphs 29 through 39 above.

**DOW ANSWER:** Dow denies the allegations in Paragraph 46 of the Complaint.

**REINHARD COMPLAINT**

47.    Dow and Mr. Liveris published the defamatory and false statements described in paragraphs 29 through 37 above, to, at a minimum, readers of The New York Times, The Wall Street Journal, Financial Times, Bloomberg, and to Dow's customers and shareholders.

**DOW ANSWER:** Dow admits that it published a press release and "An Open Letter to Our Valued Customers" on April 12, 2007; that articles were published in the *Saginaw News*, *The Wall Street Journal*, *The New York Times*, and *Bloomberg*; that Reinhard issued a press release; and that Dow issued a "Supplement to Notice of the Annual Meeting and Proxy Statement." Insofar as the allegations of Paragraph 47 of the Complaint refer to the contents of other documents, those documents speak for themselves. Dow denies that the statements attributed to it, Mr. Huntley, or Mr. Liveris were defamatory and false. Dow denies the remaining allegations of Paragraph 47 of the Complaint.

**REINHARD COMPLAINT**

48.    Dow and Mr. Liveris published the defamatory and false statements, all of which were of and concerning Mr. Reinhard, with actual malice because they either knew their statements were false, or made the statements with reckless disregard for their truth or falsity. Defendants well knew or recklessly disregarded that Mr. Reinhard did not engage in either "business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct" or "unauthorized discussions with third parties about a potential acquisition of the Company." They also knew or recklessly disregarded the fact that Mr. Reinhard did not participate in multiple meetings, in multiple months, in multiple locations, with a number of different parties, in furtherance of a takeover or acquisition of Dow, or commit any of the other misconduct falsely alleged by defendants.

**DOW ANSWER:** Dow denies the allegations in Paragraph 48 of the Complaint.

**REINHARD COMPLAINT**

49.    Dow and Mr. Liveris published the defamatory and false statements intentionally and with common law malice in that they were motivated by hatred, ill will or spite or by a reckless disregard for Mr. Reinhard's rights. Among other things, defendants made these statements in an effort to discredit Mr. Reinhard and squelch his independent voice on the Dow Board.

**DOW ANSWER:** Dow denies the allegations in Paragraph 49 of the Complaint.

**REINHARD COMPLAINT**

50.    As a direct and proximate result of the conduct described above, Mr. Reinhard has suffered financial loss and damage to his unblemished professional reputation as an ethical businessman and director.

**DOW ANSWER:** Dow denies the allegations in Paragraph 50 of the Complaint.

**REINHARD COMPLAINT**

51.    By reason of the foregoing, Mr. Reinhard demands an award of compensatory in an amount to be determined at trial, but not less than $25 million.

**DOW ANSWER:** Dow admits that Reinhard is seeking this award. However,

Dow denies that it has engaged in any acts or omissions in this state or in any other state which

would entitle Plaintiff to any relief whatsoever under state or federal law and further denies that

Plaintiff is entitled to any relief whatsoever. Dow denies the remaining allegations in Paragraph

51 of the Complaint.

**REINHARD COMPLAINT**

52.    Because defendants' conduct was willful, wanton and reckless, Mr. Reinhard also demands an award of punitive damages in an amount to be determined at trial, but not less than $25 million.

**DOW ANSWER:** Dow admits that Reinhard is seeking this award. However,

Dow denies that it has engaged in any acts or omissions in this state or in any other state which

would entitle Plaintiff to any relief whatsoever under state or federal law and further denies that

Plaintiff is entitled to any relief whatsoever. Dow denies the remaining allegations in Paragraph

52 of the Complaint.

**REINHARD COMPLAINT**

53.    Mr. Reinhard repeats and realleges the allegations contained in paragraphs 1 through 42 above.

**DOW ANSWER:** Dow incorporates its answer to Paragraphs 1-52 in its answer

to Paragraph 53 of the Complaint.

18

**REINHARD COMPLAINT**

54.    In the course of Mr. Reinhard's employment with Dow, Dow entered into various binding contracts, plans, policies, and other agreements, pursuant to which Dow agreed to pay to Mr. Reinhard compensation and benefits, including without limitation deferred stock, stock options, and pension benefits.

**DOW ANSWER:** Dow admits that the terms and conditions of plans, policies,

and agreements govern Reinhard's conduct, compensation, and benefits. Dow denies the

remaining allegations in Paragraph 54 of the Complaint.

**REINHARD COMPLAINT**

55.    Dow breached such contracts, plans, policies, and other agreements when, following Mr. Reinhard's termination on April 12, 2007, Dow ceased to pay to Mr. Reinhard the compensation and benefits to which he is entitled.

**DOW ANSWER:** Dow denies the allegations of Paragraph 55 of the Complaint.

**REINHARD COMPLAINT**

56.    At the time of Dow's breach, Mr. Reinhard had performed, and was ready, willing, and able to continue to perform, all of his obligations under all such contracts, plans, policies, and other agreements.

**DOW ANSWER:** Dow denies the allegations of Paragraph 56 of the Complaint.

**REINHARD COMPLAINT**

57.    As a result of Dow's breach, Mr. Reinhard has been damaged in an amount to be determined at trial, but not less than $25 million.

**DOW ANSWER:** Dow denies the allegations of Paragraph 57 of the Complaint.

19

## THE DOW CHEMICAL COMPANY'S AFFIRMATIVE DEFENSES

Dow sets forth the following affirmative defenses:

### First Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Reinhard is estopped by his own actions from pursuing the claims set forth in the

Complaint.

### Third Defense

Some or all of Reinhard's claims are barred by the doctrines of waiver.

### Fourth Defense

Reinhard has failed to plead special damages with particularity as required by the Federal

Rules of Civil Procedure.

### Fifth Defense

Reinhard's libel claim is barred (in whole or in part) because the statements alleged in the

Complaint are not defamatory.

### Sixth Defense

Reinhard's libel claim is barred (in whole or in part) because the statements alleged in the

Complaint are true or substantially accurate.

### Seventh Defense

Reinhard's libel claim is barred (in whole or in part) because the statements alleged in the

Complaint are non-actionable statements of opinion.

### Eighth Defense

Reinhard's libel claim is barred (in whole or in part) because the statements alleged in the

Complaint were not made with actual malice.

### Ninth Defense

Reinhard's libel claim is barred (in whole or in part) because the statements alleged in the Complaint are subject to one or more qualified privileges under applicable law.

### Tenth Defense

Reinhard's libel claim is barred (in whole or in part) because the Complaint fails to plead actual malice with the requisite specificity.

### Eleventh Defense

Reinhard's libel claim is barred (in whole or in part) by the incremental harm doctrine.

### Twelfth Defense

Reinhard's libel claim is barred (in whole or in part) by the single instance rule.

### Thirteenth Defense

Reinhard is not entitled to punitive damages under applicable law.

### Fourteenth Defense

Reinhard's injuries and damages (if any) were caused by the acts of Reinhard and his representatives, for which Dow is not responsible.

### Fifteenth Defense

Dow's actions described in the Complaint are protected by the First Amendment to the United States Constitution.

### Sixteenth Defense

Dow's performance obligations under any contracts with Reinhard were and are excused due to Reinhard's prior material breach of those agreements.

### Seventeenth Defense

Reinhard's injuries and damages (if any) were caused by acts or omissions of parties over whom Dow had no control and for whom Dow is not legally responsible.

## Eighteenth Defense

Dow reserves the right to plead such additional defenses as may be appropriate

depending upon facts later revealed during discovery.

WHEREFORE, Dow denies that it is liable to Reinhard, prays for judgment in its favor, asks the Court to dismiss Reinhard's Complaint with prejudice, and asks the Court to award Dow its reasonable attorneys' fees and legal costs incurred in this action and such other and further relief as this Court deems appropriate.

## COUNTERCLAIM

Pursuant to Federal Rule of Civil Procedure 13, The Dow Chemical Company ("Dow")

asserts its Counterclaim against J. Pedro Reinhard ("Reinhard") as follows:

## JURISDICTION

1.     This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C.

§ 1367(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1332.

## FACTUAL SUMMARY

## DOW HIRES REINHARD, WHO RISES TO A SENIOR EXECUTIVE AT DOW.

2.     Reinhard joined Dow on October 14, 1970 and rose to become one of Dow's most

senior and trusted executives. After initially joining Dow's Finance Department, Reinhard was

appointed finance director of Dow Brazil in 1978. After three years in that position, Reinhard

was appointed finance director of Dow Europe in 1981. Reinhard was elected an assistant

treasurer by Dow's Board of Directors in 1984 and became vice president of Dow Europe and

managing director of Dow in Italy in 1985. He was elevated to treasurer of The Dow Chemical

Company in 1988, was named a vice president of the company in 1990 and was elected financial

vice president in 1995. Also in 1995, Reinhard was elected to the Board of Directors, the

Executive Committee, and the Finance Committee. He was also named chief financial officer.

Reinhard was elected executive vice president in 1996. Reinhard retired as chief financial

officer effective October 1, 2005 and retired as an executive vice president effective December

31, 2005, though he retained his position as an employee director on Dow's Board of Directors.

3.     As a senior executive and director at Dow, Reinhard was intimately involved in

Dow's most important strategic decisions and had access to Dow's most sensitive, proprietary,

24

and confidential information.  As a result of his various positions, Reinhard owed Dow various fiduciary duties, including fiduciary duties of candor and undivided loyalty.

**DOW EMBARKS ON NEW STRATEGIC INITIATIVE.**

4.     The operative events in this lawsuit find a critical point in July 2006.  That month Dow held a weeklong retreat for its board and senior management.  The express aims of that retreat were (i) to educate new directors about the ins and outs of serving as a board member and (ii) to discuss corporate strategy.  Reinhard attended this meeting.

5.     During this meeting, Dow's leadership heard formal presentations reviewing a proposal that Dow pursue a new strategy to extract more value from Dow's cyclical commodities business and direct some of the resulting funds into the company's lucrative specialty-products business.

6.     This July 2006 meeting culminated with the Board adopting a significant strategy to focus on Dow's higher-profit, specialty products.  Dow would focus its global resources and formidable research and development on tackling pressing global issues with high-performance products.

7.     As a director, Reinhard was also directly responsible for overseeing this new strategy.  He received regular updates on its implementation.  He participated actively in essential oversight and direction.  Reinhard knew exactly where Dow was moving.

8.     Armed with this knowledge of Dow's innermost secrets and latest plans, Reinhard would launch on a course of deception and betrayal.

25

**FOLLOWING DOW'S NEW STRATEGIC INITIATIVE, THERE ARE REPEATED PRESS REPORTS OF MAJOR PROPOSED TRANSACTIONS INVOLVING DOW, WHICH CLOUDED DOW'S FUTURE AND ROILED ITS MANAGEMENT AND EMPLOYEES.**

9.      Soon after Dow began to pursue its new strategic initiative, repeated press reports began to surface that Dow was going to be involved in a major proposed transaction. These press reports clouded Dow's future, distracted Dow from its business objectives, and roiled its management and employees. Accordingly, Dow began an effort to assuage these negative effects on Dow's business, determine the source of these rumors, and assess their validity.

10.      The first press coverage was in January 2007. Specifically, on the morning of January 18, 2007, the *Financial Times* ran a story in which it was reported that "talk in the market was that a consortium of private equity groups was working on a break-up bid for Dow Chemical."

11.      The rumors in the January 18, 2007 *Financial Times* story were disruptive and a matter of great concern to Dow. Accordingly, Dow began an inquiry to determine: (i) whether there was a basis for these rumors; and (ii) the source of these rumors. As part of this inquiry, Dow pursued information from the investment banking and financial community regarding potential bids for some or all of Dow. Although Reinhard was aware of this inquiry and its importance to Dow, he did not inform Dow about any knowledge he had regarding these rumored transactions involving Dow.

12.      Dow's Board of Directors discussed the January 18, 2007 *Financial Times* rumors at its February 14, 2007 board meeting. Although Reinhard attended that meeting, he did not tell the board members that he had any knowledge about potential major transactions involving Dow.

13.    On the morning of February 25, 2007, the *Sunday Express* reported that Dow was "set to become the target of the world's largest-ever leveraged buyout," with three private equity firms ready to bid $54 billion for Dow.

14.    As with the January 18, 2007 *Financial Times* rumors, the rumors in the February 25, 2007 *Sunday Express* story were again disruptive and a matter of great concern to Dow. Accordingly, Dow vigorously continued its inquiries, including its inquiries with the investment banking and finance community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors. Although Reinhard was aware of these inquiries and their importance to Dow, again Reinhard did not inform Dow about any knowledge he had about potential major transactions involving Dow.

15.    On March 12, 2007, the *Evening Standard* ran a story naming a banker as the "mastermind" of a $60 billion leveraged buyout of Dow, which would be "the largest buyout the world has ever seen."

16.    As with the January 18, 2007 *Financial Times* rumors and the February 25, 2007 *Sunday Express* rumors, the rumors in the March 12, 2007 *Evening Standard* story were again damaging and a matter of great concern to Dow. Accordingly, Dow continued its quest to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors. Although Reinhard was aware of these inquiries and their importance to Dow, again Reinhard did not inform Dow about any knowledge he had about discussions among certain third-parties regarding potential transactions involving Dow.

17.    The persistent rumors about potential transactions involving Dow were taken up specifically at a March 16, 2007 meeting of Dow's Board of Directors, which Reinhard attended.

Case 1:07-cv-03641-RPP    Document 4    Filed 05/29/2007    Page 28 of 44

18.    At the March 16 meeting of Dow's Board of Directors, Reinhard did not inform Dow that he had any knowledge about discussions among third-parties regarding potential major transactions involving Dow.

**IT IS FINALLY REVEALED — BY SOURCES OTHER THAN REINHARD — THAT REINHARD WAS MEETING WITH INVESTMENT BANKERS REGARDING POTENTIAL MAJOR TRANSACTIONS INVOLVING DOW.**

19.    The events that unfolded after the March 16 meeting of Dow's Board of Directors culminated in the identification of Reinhard as a person who had played a role in discussions about potential major transactions involving Dow.

20.    On April 8, 2007, the *Sunday Express* trumpeted that a buyout of Dow "could be days away, as a consortium of Middle Eastern investors and American buyout firms puts the finishing touches to an approach for U.S. giant Dow Chemical."

21.    As with the previous rumors regarding potentially huge transactions involving Dow, the rumors in the April 8, 2007 *Sunday Express* story were disruptive and a matter of great concern to Dow.    Accordingly, Dow continued its inquiries, including inquiries with the investment banking and finance community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors.    Although Reinhard was aware of these inquiries and their importance to Dow, Reinhard did not inform Dow that he had any knowledge about discussions among third-parties regarding potential major transactions involving Dow.

22.    Within 48 hours of the *Sunday Express* story, information regarding potential transactions involving Dow that wasn't revealed by Reinhard was shared with Dow by a major international financial institution (the "Bank").

23.    On April 9, 2007, Dow issued a press release stating: "The Company has had no discussions about a leveraged buyout."    The press release did not cause Reinhard to come forward or otherwise divulge the role he had played.

28

24.     That same day, the Bank's CEO and another senior banker traveled to Midland, Michigan to have a previously-scheduled dinner with two senior executives from Dow, including Dow's CEO. That evening, the Bank's CEO explained that the Bank's London affiliate had been working on behalf of certain Middle Eastern investors on potential major transactions involving Dow. The Bank's CEO subsequently explained that a variety of potential transactions were being discussed, including a purchase of Dow in its entirety. He also revealed that people close to Dow were involved in the discussions, and he committed to identifying who those persons were.

25.     On April 10, 2007, a day after their dinner, the Bank's CEO called Dow's CEO and identified Reinhard and Kreinberg as the Dow employees involved in the discussions with third-parties about a major transaction involving Dow. He also told Dow's CEO that these two Dow employees had discussions with representatives of the Bank's London affiliate.

## DOW'S BOARD OF DIRECTORS ACTS DELIBERATELY AND PROMPTLY TO TERMINATE REINHARD'S EMPLOYMENT.

26.     Accordingly, three months after the extraordinarily distracting rumors about Dow first surfaced, Dow finally learned that two of its most trusted senior executives, including Reinhard, had not disclosed their personal involvement in unauthorized discussions with third-parties at the center of the rumored transactions. This startling realization was worsened by the fact that Dow did not learn of the senior executives' involvement from the senior executives themselves, but rather from a third party source.

27.     Early on April 11, 2007, Dow's CEO informed Dow's Presiding Director and the Chair of Dow's Audit Committee of the information that he had learned from the Bank's CEO. Dow's Board of Directors had a regularly scheduled meeting on April 11, and Dow's CEO, as Chairman, made this first item of business for the meeting at 3:45 p.m. Reinhard was not

present at the meeting as he had previously informed Dow's CEO that he had a conflict that day. Dow's CEO presented to the Board the information he had, and then asked for the Board's thoughts as to how he should proceed. The Board discussed the situation at length and asked many questions about the activities of Reinhard and Kreinberg and the credibility of the information provided to Dow's CEO by the Bank's CEO. There was unanimous agreement among the directors that the information was credible, and that the two employees should be terminated.

28.    However, the Board asked Dow's CEO to meet with each employee, present the newly-uncovered information, and ask for their explanation. Those meetings were arranged for 7:00 a.m. on April 12, 2007. The Board asked the following individuals to join Dow's CEO at the meetings: Charles Kalil, Paul Stern, and Arnold Allemang (a member of the Board). Martin Lipton, outside counsel for Dow, also attended.

29.    On April 12, 2007, the group identified above met with Reinhard, beginning at 7:00 a.m. Reinhard denied the allegations without offering any sort of explanation.

30.    Given the aforementioned denials, and following those meetings, Dow's CEO and its outside counsel placed calls to the Bank's CEO and the Bank's general counsel. The Bank's CEO reconfirmed the information that he had previously provided to Dow's CEO.

31.    The Executive Committee of Dow's Board met the morning of April 12, 2007 and the other Directors, with the exception of Reinhard, were invited to attend. Dow's CEO informed the Committee of the meetings with Reinhard, the fact that his employment was terminated, as well as the follow-up calls to the Bank's CEO and general counsel.

30

32.    As a result of serious misconduct and conduct harmful to the interest of the Company, including breaches of fiduciary duty and breaches of the express terms of contracts with Dow, Dow terminated the employment of Reinhard.

## REINHARD HAS PLAINLY BREACHED HIS COMPENSATION AGREEMENTS WITH DOW.

33.    Dow acted promptly to terminate Reinhard's employment due to his repeated and serious misconduct that served to advance his own agenda at the expense of Dow. As described in more detail below, Reinhard's actions and the consequent termination of his employment by Dow has serious effects on his past and present compensation arrangement, including the cancellation of certain outstanding equity awards and the obligation of Reinhard to repay certain amounts previously realized in respect of certain equity awards.

34.    Reinhard has received significant equity-based awards under, among other plans, The Dow Chemical Company 1988 Award and Option Plan (the "1988 Plan"). Reinhard has received the following relevant equity awards under the 1988 Plan: (i) awards of stock options ("Stock Options"), (ii) awards of performance shares (including certain performance deferred shares) ("Performance Awards") and (iii) awards of deferred stock (including certain other performance deferred shares) ("Deferred Stock Awards"). In addition, Reinhard receives dividend unit awards ("Dividend Units") under The Dow Chemical Company Dividend Unit Plan (the "Dividend Unit Plan"). These four types of awards are referred to as the "Equity Awards." Immediately prior to the termination of his employment, Reinhard had outstanding Equity Awards with an estimated value of $16,200,000 and, in the three years prior to his termination, Reinhard had realized approximately $14,700,000 in value from his Equity Awards. These awards were made by Dow to, among other things, encourage and reward loyal service to Dow.

31

A.     **Equity Awards Issued Under the 1988 Plan**

35.     The 1988 Plan is administered by Dow's Compensation Committee. Section 4.02 of the 1988 Plan provides that the Compensation Committee has the full power to interpret and administer the Plan and that any "interpretation by the [Compensation] Committee of the terms and provisions of the Plan and the administration thereof, and all action taken by the [Compensation] Committee, shall be final, binding and conclusive on the Company, . . . all Employees, their respective legal representatives, successors and assigns and upon all other persons claiming under or through any of them."

36.     Each Equity Award made to Reinhard under the 1988 Plan is subject to the terms and conditions of the 1988 Plan itself and an award agreement that sets out certain very specific conditions that apply to such awards. Although the terms and conditions applicable to each such Equity Award vary somewhat in detail, and with one exception not here relevant, each Equity Award issued to Reinhard under the 1988 Plan that is relevant to this claim provides that (i) the Equity Award is immediately canceled and forfeited if the holder's employment with Dow and its affiliated companies is terminated for any reason other than death, disability or retirement, (ii) each Equity Award that has not previously been terminated is canceled and forfeited if the holder engages in certain activities determined to be harmful or adverse to Dow or its affiliates and (iii) if the holder engages in certain activities determined to be harmful or adverse to Dow or its affiliates, the holder may be required to repay any value the holder received in respect of any Equity Award during the three-year period preceding such activities.

37.     By way of example, Section 2 of certain agreements covering Stock Options granted to Reinhard provides that "[e]xcept in the case of death, disability or retirement, this Agreement shall terminate as soon as you are no longer employed by the Company or any Subsidiary or Affiliate (collectively, a "Dow Company"), notwithstanding the fact that the stated

32

term of this Agreement may not have expired." Section 7 of these Stock Option agreements provide that "[i]f you engage . . . in any activity harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . then any Option under this Agreement shall terminate effective on the date on which you enter into such activity. . . . The Compensation Committee shall, in its sole discretion, determine whether the above conditions have been met, and the determination of the Compensation Committee shall be final and binding as to all parties." Section 6 of these Stock Option agreements further provide that "[i]f at any time within three years after you exercise any portion of this Option you engage in any activity, . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . any [option spread realized] on the date of exercise shall be paid by you to the Company."

    38.    In the same vein, Section 6 of certain agreements covering Performance Awards granted to Reinhard provides that "[e]xcept in the case of retirement, disability or death, this Agreement shall terminate upon your voluntary or involuntary termination of a Dow Company. Participation shall be automatically terminated and all rights under this Agreement forfeited by you if the Compensation Committee, in its sole judgment, determines that you have at any time during the term of this Agreement engaged in any activity harmful to the interests of or in competition with a Dow Company." Section 8 of these Performance Award agreements further provide that "[i]f at any time within three years after the end of the Performance Period, you engage in any activity . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may

be sought, . . . the [value previously received pursuant to the Performance Award] shall be paid by you to the Company."

39.    Section 4 of certain agreements covering Deferred Stock Award granted to Reinhard similarly provides that "[t]his Agreement shall terminate and your rights under this Agreement shall be forfeited if you employment with any Dow Company is terminated for any reason other than death, disability or retirement." Section 8 of these Deferred Stock Award agreements further provide that "[i]f you at any time during the term of this Agreement you engage in any act of Unfair Competition (as defined below), this Agreement shall terminate effective on the date on which you enter into such act of Unfair Competition . . . In addition, if at any time within three years after issuance and delivery of this Deferred Stock you engage in any act of Unfair Competition, you shall promptly pay to the Company the [value previously received pursuant to the Deferred Stock Award]. The Compensation Committee shall, in its sole discretion, determine when any act of Unfair Competition has occurred, and the determination of the Compensation Committee shall be final and binding as to all parties. For purposes of this Agreement, the term 'Unfair Competition' shall mean and include activity on your part that . . . is or may be harmful to the interests of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought . . . ."

**B.    Equity Awards Issued Under the Dividend Unit Plan**

40.    The Dividend Unit Plan is also administered by the Compensation Committee. Section 4.02 of the Dividend Unit Plan provides that the Compensation Committee has the full power to interpret and administer the Plan and that any "interpretation by the Compensation Committee of the terms and provisions of the Plan and the administration thereof, and all action taken by the Compensation Committee, shall be final, binding and conclusive on the

Company, . . . all Employees, their respective legal representatives, successors and assigns and upon all other persons claiming under or through any of them."

41.    Each Equity Award made to Reinhard under the Dividend Unit Plan is subject to the terms and conditions of the Dividend Unit Plan. The Dividend Unit Plan provides that Dividend Units may be forfeited "if the Awardee terminates his or her employment with the Company or its Subsidiaries for any reason other than death or retirement . . . Dividend Units may further be forfeited by an Awardee if the Committee determines that the Awardee has at any time engaged in any activity harmful to the interest of or in competition with the Company or its Subsidiaries or accepts employment with a competitor."

### C.    Termination of Reinhard and the Effect on His Equity Awards

42.    At a meeting duly convened on April 12, 2007, the Compensation Committee discussed the termination of Reinhard and determined that he had engaged in serious misconduct and conduct harmful to the interests of Dow. The Compensation Committee then authorized certain employees of Dow to take any and all action on behalf of Dow as may be necessary and sufficient to freeze, terminate and/or "claw-back" any and all remuneration and benefits of Reinhard. At this meeting, the Compensation Committee did not conclude that Reinhard had retired from Dow for purposes of any of his Equity Awards.

43.    As a result of Dow's prompt and proper action in terminating Reinhard for the actions described herein, Dow (i) is entitled to be repaid certain amounts realized by Reinhard in connection with Equity Awards previously granted to him under the 1988 Plan and (ii) has no further obligations to Reinhard under any Equity Awards outstanding at the time of his termination of employment. Dow now brings this counterclaim to recover these amounts.

**D.    Reinhard Forfeits Other Benefits by Breaching His Duty of Loyalty**

44.    During his employment with Dow, Reinhard participated in the Key Employee Insurance Program ("KEIP"), a nonqualified employee pension benefit plan subject to ERISA. Dow is the plan administrator for the KEIP.    These KEIP benefits are subject to offset for damages caused by, and forfeiture in the event of, a participant's breach of duty of loyalty to his employer.    Reinhard has breached his duty of loyalty to Dow and is not entitled to any benefits under the KEIP.

45.    On April 12, 2007, Dow terminated the employment of Reinhard as a consequence of his serious misconduct that was harmful to the interest of the company.    Dow, which is plan administrator of The Dow Chemical Company Medical Care Program ("Medical Plan"), determined that the Reinhard is not entitled to "COBRA" health continuation coverage under the Medical Plan pursuant to ERISA's "gross misconduct" exception (ERISA § 603(2)) to COBRA coverage.    Furthermore, upon the end of his employment, pursuant to Section 606 of ERISA, 29 U.S.C. § 1166, Dow, as plan administrator of the Medical Plan, would have ordinarily provided Reinhard notice of his respective COBRA rights (*i.e.*, rights to temporary continuation of health benefits) through its third-party administrator.    Due to Reinhard's gross misconduct, however, Dow, as plan administrator, is not required by ERISA to notify Reinhard of his COBRA rights, and therefore has not provided Reinhard with notice of their respective COBRA rights.

## COUNT I

### (BREACH OF FIDUCIARY DUTY)

46.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 45, inclusive.

36

47.    Reinhard, by virtue of his position as an employee and director of Dow, owed Dow various fiduciary duties, including the fiduciary duties of loyalty and candor.

48.    Reinhard breached his fiduciary duties to Dow by, among other things, engaging in secret and unauthorized discussions for his own benefit with third-parties regarding proposed transactions involving Dow, and by failing to disclose those discussions even while Dow was searching to determine the validity and source of rumors that Dow was about to be hostilely acquired by a third party. These rumors were doing great damage to Dow and were highly disruptive.

49.    As a result of Reinhard's breaches of fiduciary duty, Dow has been damaged in an amount to be proven at trial.

**COUNT II**

**(BREACH OF CONTRACT)**

50.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 49, inclusive.

51.    Dow and Reinhard are parties to agreements covering Equity Awards issued under the 1988 Plan.

52.    The agreements covering each Deferred Stock Award, Stock Option, and Performance Award, are valid, binding, and enforceable contracts between Dow and Reinhard.

53.    Each of the agreements covering each Deferred Stock Award provides that Reinhard is required to repay amounts realized in respect of the Deferred Stock Award within three years of the date Reinhard engages in activity harmful to the interests of Dow or its affiliates. As an illustrative example, paragraph 8 of a Deferred Stock Award agreement to which the Plaintiff is a party provides:

37

> If at anytime within three years after issuance and delivery of this Deferred Stock
> you engage in any act of Unfair Competition, you *shall promptly pay* to the
> Company the Fair Market Value of Shares Earned and Dividends Equivalents
> paid. The Compensation Committee shall, in its sole discretion, determine when
> any act of Unfair Competition has occurred, and the determination of the
> Compensation Committee shall be *final and binding* as to all parties. For
> purposes of this Agreement, the term "Unfair Competition" shall mean and
> include activity on your part that . . . is or may be harmful to the interests of a
> Dow Company, including but not limited to conduct related to your employment
> for which either criminal or civil penalties against you may be sought . . .

*(emphasis added)*

54.    On April 12, 2007, Dow's Compensation Committee determined that Reinhard

had engaged in serious misconduct and conduct harmful to the interests of Dow and authorized

certain officers of Dow to take all actions necessary and sufficient to "claw-back" any and all

remuneration and benefits, in whatever form, of Reinhard.

55.    Despite this finding by Dow's Compensation Committee, which is "final and

binding as to all parties," Reinhard has breached its obligation to pay promptly to Dow "the Fair

Market Value of Shares Earned and Dividends Equivalents paid" under the agreements covering

each Deferred Stock Award.

56.    Each of the agreements covering each Stock Option provides that Reinhard is

required to repay amounts realized in respect of the Stock Option within three years of the date

Reinhard engages in activity harmful to the interests of Dow or its affiliates. As an illustrative

example, paragraph 6 of a Stock Option agreement to which Reinhard is a party provides:

> If at any time within three years after you exercise any portion of this Option you
> engage in any activity . . harmful to the interest of a Dow Company, including
> but not limited to conduct related to your employment for which either criminal or
> civil penalties against you may be sought, . . . any [option spread realized] on the
> date of exercise shall be paid by you to the Company.

38

57.    Despite Dow's Compensation Committee's finding on April 12, 2007, that Reinhard had engaged in misconduct, Reinhard has breached his obligation to pay promptly to Dow the option spread realized under the agreements covering each Stock Option.

58.    Each of the agreements covering each Performance Award provides that the Reinhard is required to repay amounts realized in respect of the Performance Award if, within three years of the end of the applicable performance period, Reinhard engages in activity harmful to the interests of Dow or its affiliates. As an illustrative example, paragraph 8 of a Performance Award agreement to which Reinhard is a party provides:

> If at any time within three years after the end of the Performance Period, you engage in any activity . . . harmful to the interest of a Dow Company, including but not limited to conduct related to your employment for which either criminal or civil penalties against you may be sought, . . . the [value previously received pursuant to the Performance Award] shall be paid by you to the Company.

59.    Despite Dow's Compensation Committee's finding on April 12, 2007, that Reinhard had engaged in misconduct, Reinhard has breached his obligation to pay promptly to Dow the value previously received pursuant to the Performance Award under the agreements covering each Performance Award.

60.    As a result of Reinhard's breaches of contract, Dow has suffered damages in an amount to be proven at trial.

## COUNT III

## (DECLARATORY JUDGMENT)

61.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 60, inclusive.

62.    Dow seeks a judicial determination and declaration of its contractual rights pursuant to 28 U.S.C. § 2201.

39

63.    Specifically, Dow is entitled to a declaratory judgment that Reinhard is obligated

to:

      (a)    Pursuant to the terms of the 1988 Plan and each agreement covering each Deferred Stock Award, pay to Dow the fair market value of any Deferred Stock Awards received during the three-year period prior to the date Reinhard engaged in misconduct harmful to Dow and/or its affiliates.

      (b)    Pursuant to the terms of the 1988 Plan and each Stock Option agreement, pay to Dow the option spread on the date of exercise of each Stock Option exercised during the three-year period prior to the date Reinhard engaged in misconduct harmful to Dow and/or its affiliates.

      (c)    Pursuant to the terms of the 1988 Plan and each agreement covering each Performance Award, pay to Dow the value received pursuant to Performance Award with respect to which the applicable performance period ended during the three-year period prior to the date Reinhard engaged in misconduct harmful to Dow and/or its affiliates.

64.    There is an actual controversy within the jurisdiction of this Court between Dow and Reinhard with respect to Reinhard's obligation to repay certain amounts of the Equity Awards in that Reinhard has denied engaging in harmful conduct that would trigger his repayment obligations.

65.    Resolution of this controversy requires a declaration by this Court of the Reinhard's repayment obligations with respect to his Equity Awards.

## COUNT IV

## (DECLARATORY JUDGMENT)

66.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 66, inclusive.

67.    Dow seeks a judicial determination and declaration of its contractual rights pursuant to 28 U.S.C. § 2201.

68.    Dow respectfully requests that this Court declare that Dow has no further obligation to Reinhard in respect of his Equity Awards, whether issued pursuant to the 1988 Plan or the Dividend Unit Plan. As set forth above, each of the Equity Awards were to be terminated and forfeited upon the termination of Reinhard's employment for any reason other than death or, in most cases, disability or retirement. Because the Compensation Committee did not determine that Reinhard "retired" for purposes of these Equity Awards, these Equity Awards are no longer in force or effect.

69.    Moreover, each Equity Award provides that it is to be terminated and forfeited if Reinhard engaged in activities harmful to Dow or certain of its affiliates. The Compensation Committee specifically determined that Reinhard engaged in serious misconduct and conduct harmful to the interests of Dow. Accordingly, each of the Equity Awards is no longer in force or effect.

70.    There is an actual controversy within the jurisdiction of this Court between Dow and Reinhard with respect to his rights to the Equity Awards in that the Reinhard has denied engaging in harmful conduct that would terminate his rights to the Equity Awards.

## COUNT V

### (DECLARATORY JUDGMENT)

71.    Dow realleges and incorporates by reference each of the allegations made herein at paragraphs 1 through 70, inclusive.

72.    Pursuant to 28 U.S.C. § 2201, Dow seeks a judicial determination and declaration of its contractual rights and its legal rights under ERISA.

41

73.    Dow respectfully requests that this Court declare that:

    (a)   Reinhard has forfeited any and all benefits under the KEIP as a result of Reinhard's disloyal conduct;

    (b)   Dow has a right to offset against amounts payable to Reinhard under the KEIP for damages sustained by Dow as a result of Reinhard's disloyal conduct; and

    (c)   Due to Reinhard's gross misconduct, Dow is not required by ERISA to notify Reinhard of his COBRA rights.

74.    There is an actual controversy within the jurisdiction of this Court between Dow and Reinhard with respect to Reinhard's rights to benefits under the KEIP.

75.    There is an actual controversy within the jurisdiction of this Court between Dow and Reinhard with respect to Reinhard's rights to notice of his COBRA health continuation coverage in that Reinhard has denied his gross misconduct.

76.    The dollar value of these forfeited pension and other benefits are substantial, and, upon information and belief, exceeds $5,000,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Dow respectfully requests that this Honorable Court hold a jury trial and:

    (a)   Enter judgment for Dow on all of its claims; and

    (b)   Award Dow all amounts that it is entitled to as a result of Reinhard's breaches of fiduciary duty, together with interest, costs, attorney's fees, punitive damages, and such other relief as may be just and equitable.

42

(c)     Award Dow all amounts that it is entitled to as a result of Reinhard's breaches of contract, together with interest, costs, attorney's fees, and such other relief as may be just and equitable.

(d)     Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Reinhard is obligated to:

> (i)     Pursuant to the terms of the 1988 Plan and each agreement covering each Deferred Stock Award, pay to Dow the fair market value of any Deferred Stock Awards received during the three-year period prior to the date Reinhard engaged in misconduct harmful to Dow and/or its affiliates;

> (ii)     Pursuant to the terms of the 1988 Plan and each Stock Option agreement, pay to Dow the option spread on the date of exercise of each Stock Option exercised during the three-year period prior to the date Reinhard engaged in misconduct harmful to Dow and/or its affiliates;

> (iii)     Pursuant to the terms of the 1988 Plan and each agreement covering each Performance Award, pay to Dow the value received pursuant to Performance Award with respect to which the applicable performance period ended during the three-year period prior to the date Reinhard engaged in misconduct harmful to Dow and/or its affiliates; and

(e)     Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Dow has no further obligation to Reinhard with respect to his Equity Awards;

(f)     Award Dow a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that:

> (i)     Reinhard has forfeited any and all benefits under the KEIP as a result of Reinhard's disloyal conduct;

43

    (ii)    Dow has a right to offset against amounts payable to Reinhard under the KEIP for damages sustained by Dow as a result of Reinhard's disloyal conduct; and

    (iii)    Due to Reinhard's gross misconduct, Dow is not required by ERISA to notify Reinhard of his respective COBRA rights; and

(g)    Award Dow such other relief as may be just and equitable.

Dated: May 29, 2007

Respectfully submitted,

s/
David M. Bernick, P.C.
Peter Duffy Doyle (PD 1735)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Defendant and Counterclaimant
THE DOW CHEMICAL COMPANY

44